370 A.2d 1197

COMMONWEALTH of Pennsylvania

v.

**Darrell TAYLOR, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued Nov. 18, 1976.

Decided March 16, 1977.

2

4

6

Edward G. Rendell, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Mark Sendraw, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

EAGEN, Chief Justice.

Darrell Taylor was convicted by a jury in Philadelphia of murder of the second degree, robbery, and possession of instruments of crime and prohibited offensive weapons. Post-verdict motions were denied by a court en banc. Thereafter, judgments of sentence of life imprisonment and not less than five nor more than fifteen years imprisonment were imposed on the murder and robbery convictions respectively. Judgment of sentence on the other conviction was suspended. These appeals followed.[1]

Taylor advances four assignments of error as grounds for a new trial. Since we agree a new trial is required, we shall discuss only two: that which mandates a new trial and the admissibility of an incriminatory statement given by Taylor to police.[2] The latter will undoubtedly be at issue in any further proceeding, accordingly, the interest of advancing the efficient administration of justice compels discussion of it here. *Commonwealth v. Smith*, 470 Pa. 220, 368 A.2d 272 (1977).

Prior to trial, a suppression hearing was held and the court ruled evidentiary use of the statement would be permitted at trial. Taylor argues this ruling was erroneous and the introduction of the statement into evidence at trial violated his rights because: 1) the statement is

1. The appeal from the sentence imposed on the murder conviction was filed in this Court. The appeal from the sentence imposed on the robbery conviction was filed in the Superior Court and later certified here.

2. Taylor's other assignments of error are: 1) the trial judge denied him a fair trial by extensively questioning certain witnesses; and, 2) the trial court erred in refusing to grant a mistrial when a witness made certain unresponsive and prejudicial comments.

the product of an illegal arrest; 2) the statement is the product of unnecessary delay between arrest and arraignment; and, 3) the statement was involuntarily given.

■ Because the suppression court determined the statement was admissible, in reviewing each of Taylor's contentions in regard thereto, we may consider only the evidence presented by the Commonwealth and so much of the evidence for the defense, as fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth v. Goodwin,* 460 Pa. 516, 333 A.2d 892 (1975). So viewed, the record establishes the following:

On August 30, 1974, a robbery took place at a food market at 1632 Ridge Avenue, Philadelphia. While the robbery was in progress, Elaine Jackson was fatally shot by the felon. Detective Scanzello was assigned to investigate the case and spoke with Joseph Clarke, Jackson's fifteen-year-old grandson, on the same day of the occurrence. Clarke told Scanzello that he was in the market when the crimes took place; that the robber was a "Negro male, approximately 5'6", . . . light complexioned, and small frame;"[3] that he (Clarke) ran out of the market to get his mother, Jackson's daughter, while the robbery was in progress; that, when he returned to the market, he saw the robber "run down Ridge Avenue and turn into Francis Street, a street that intersects with Ridge, and as he was running down the street,

3. During cross-examination of Scanzello, defense counsel, in an attempt to discredit the information given by Clarke to Scanzello with regard to whether or not the perpetrator was clean-shaven, stated: "You said in your testimony that Joseph Clarke described the assailant as about twenty-nine, Negro, short, medium build, wearing a cool cap, black waist jacket, clean-shaven, sunglasses, silver and round, like you were looking into a mirror."
Scanzello did not testify in this manner at the suppression hearing, but since Scanzello did not disaffirm so testifying, we shall treat counsel's remark as the testimony of Scanzello for purposes of this appeal.

he was stuffing money up under his jacket." Clarke did not identify Taylor as the perpetrator at any time prior to Taylor's arrest.

On September 2, 1974, Scanzello interviewed Michael Franklin at the Police Administration Building. Franklin, a 21-year-old male, told Scanzello that on the day of the robbery and shooting he had been walking down the street when he saw a man he knew as "Darrell hiding in the alley at Leland and Francis Streets, and that . . he saw a wad of money stuffed in [Darrell's] pants pocket, and Darrell was peeking out of the alley, and the bus came and Darrell ran from the alley and caught the bus and left, and he said he then continued to the food market and found out that subsequently—that [Jackson] had died, and other people had been in the store."

Franklin told Scanzello that he knew where "Darrell" lived although he did not know the street number. Scanzello went with Franklin to Hunting Park Avenue, and Franklin pointed out "Darrell's" residence. Scanzello subsequently determined Darrell Taylor lived in the residence. Scanzello obtained a photograph of Taylor and showed it to Franklin. Franklin then identified Taylor as the man he saw hiding in the alley.

Scanzello also obtained physical descriptions of the robber from numerous persons who were eyewitnesses and information about the direction in which he fled, i. e. down Ridge onto Francis and then onto Leland, from persons who viewed the flight. All of this information led him to believe Taylor was the felon.

It was also established that Ridge Avenue runs parallel to Leland and that Francis Street intersects both Leland and Ridge, and that Francis Street intersects Ridge approximately one and one-half blocks from the market.

Scanzello reported his findings to a superior in the police department, and requested that Taylor be arrested by detectives working a day shift. As a result, Detective

Verbrugghe was ordered to "pick up" Taylor and he did so at 7:00 a.m. on September 4, 1974. The arrest was made without a warrant.

Taylor was transported to the Police Administration Building by Verbrugghe and Detective McMillan. Taylor arrived there at 7:45 a.m. and was taken to the homicide division. At 7:53 a.m., Taylor was placed in an interview room and searched. Taylor was then asked if he wanted anything to eat but indicated he only wanted coffee. He was given coffee and then left alone until 8:12 a.m. At the time, Verbrugghe and McMillan entered the room. Taylor told them he was twenty-one years of age and also gave the officers his address, date of birth, place of employment and social security number. Verbrugghe advised Taylor that he was being questioned with regard to the "homicide by shooting of Elaine Jackson, forty-seven, Negro female, residence, 1534 Parrish Street, and the robbery of a Premier Food Market that occurred on Friday, August 30, 1974, inside the food market." Taylor was advised of his constitutional rights but indicated he did not wish to remain silent and did not wish to have a lawyer present. An interview followed during which Taylor denied any knowledge of the crimes but consented to a polygraph test. At 8:31 a.m. this interview concluded. Taylor then read and signed a polygraph examination agreement.

Taylor was left alone until a polygraph examination room became available. At 9:10 a.m., he was taken to a polygraph examination room. An examination was administered and concluded at 10:30 a.m. At that time, Taylor was taken to a lavatory and given water. At 10:36 a.m., Taylor was taken to an interview room. Verbrugghe then told Taylor he had failed the polgraph examination and read each question and answer which was asked and given during the polygraph examination. Taylor then admitted his involvement in the crimes. He was questioned concerning the crimes and the questions

and responses were written out by Verbrugghe. Taylor was then asked to read the written account aloud and he did so. At 11:53 a.m., he signed each page of the statement. This statement was admitted into evidence at trial over objection.

The suppression court found that Taylor first incriminated himself about three hours after his arrival at the Police Administration Building and signed a recorded incriminatory statement approximately four hours after his arrival.

The court also found that Taylor appeared normal and alert during this entire period and he was not subjected to threats or promises. The court further found that Taylor's signatures on the polygraph consent form and incriminatory statement were "written in a firm and steady hand."

Arraignment was delayed until 4:25 p.m. while police searched for certain evidence at the scene of the crime. In the interim, Taylor was interviewed again but no new facts were elicited. He was also allowed to make three phone calls to his sister but each time the phone was busy.

The suppression court found that, although Taylor was normal and alert when he gave the incriminatory statement, he was "ill, was clutching his stomach, sweating and demonstrated signs which have been described as typical of the effects of withdrawal from narcotics" at the time of arraignment. Taylor testified that he was a narcotics addict and that he had taken heroin between 11:00 p.m. and 12:00 p.m. the night prior to his arrest.

Initially, we must determine if the arrest of Taylor was constitutionally infirm.

"The law is clear a warrantless arrest is constitutionally invalid unless based on probable cause, which is defined as, facts and circumstances within the arresting officer's knowledge and of which he had reasona-

bly trustworthy information, sufficient in themselves to warrant a man of reasonable caution to believe an offense has been or is being committed, and the person to be arrested has committed the offense."

*Commonwealth v. Jeffries*, 454 Pa. 320, 323, 311 A.2d 914, 916 (1973).

Instantly, although Detective Verbrugghe did not have sufficient knowledge to constitute probable cause, he was ordered by a superior officer to arrest Taylor and this officer had been informed of the information in possession of Detective Scanzello. We must, therefore, examine the knowledge which Scanzello possessed in order to determine if probable cause existed. *Commonwealth v. Whitson*, 461 Pa. 101, 334 A.2d 653 (1975); *Commonwealth v. Rush*, 459 Pa. 23, 326 A.2d 340 (1974). There is no question that Scanzello had sufficient trustworthy information to know a felony had been committed, and the only question is whether he had sufficient knowledge based on reasonably trustworthy information to believe Taylor was the felon.

Scanzello had a description of the perpetrator, albeit a general one, from Clarke, an eyewitness, which was verified by other witnesses. He knew the direction of the felon's flight, which he obtained from Clarke and this account of the flight was corroborated by other persons who viewed it. Additionally, Franklin's observations of Taylor hiding in an alley not far from the scene of the robbery and in the precise area Taylor's line of flight would have taken him, his observation of a "wad of money" in Taylor's pocket, his observation of Taylor running out from hiding to catch a bus, and his identification of Taylor, which matched Clarke's general description [4] all

4. Taylor argues that Clarke's description of Taylor included "clean-shaven" and that, since Taylor had a mustache when arrested, the information given Scanzello by Clarke does not serve to establish probable cause. First, five days passed between the day of the crimes and Taylor's arrest. Second, even assuming Taylor had a mustache on the day of the crimes, his face might

corroborated the information given by Clarke. Given the corroboration by other witnesses of the information obtained from Clarke; the inherent corroboration between Clarke's description and Franklin's identification of Taylor, who fit the description; the inherent corroboration between Clarke's indication of the direction of flight and Franklin's observation of Taylor hiding [5] in a location along the line of flight; and, the inherent corroboration between Franklin's observation of a wad of money and Clarke's account concerning money, the information Scanzello had must be considered trustworthy. *Commonwealth v. Culmer*, 463 Pa. 189, 344 A.2d 487 (1975); *Commonwealth v. Mamon*, 449 Pa. 249, 297 A.2d 471 (1972).

Further sufficient knowledge to warrant a man of reasonable caution to believe Taylor was the felon existed. Taylor was positively identified by Franklin as the man he saw hiding and Taylor was connected to the other information obtained about the robber: by the wad of money and the fact that money was stolen; by his location while hiding and the line of the perpetrator's flight; by the relatively short time lapse between the robbery

otherwise have been clean-shaven, and further, this one possible contradiction is not sufficient to discount the numerous other facts supplied by Clarke which were corroborated.

5. Taylor argues Franklin's observations of him may not serve to establish probable cause because a time lapse of "at least ten minutes" exists between the crimes and Franklin's observations. Taylor's estimation of the time lapse is founded on the following: Franklin lived two and one-half blocks from the market; his sister apparently learned what occurred in the market when she congregated outside the market; when she learned Jackson had been shot, she went to tell Franklin; Franklin then set out toward the market and made his observations on the way—approximately one block from his residence and one and one-half blocks from the market. Even assuming ten minutes lapsed, such a lapse does not require us to disallow the information supplied by Franklin. The time lapse is relatively short, compare *Commonwealth v. Jones*, 457 Pa. 423, 322 A.2d 119 (1974), and does not render Franklin's account any less reliable because it is entirely consistent with Franklin's account that Taylor was hiding in the alley awaiting a bus.

and the time at which he was observed hiding; and, by Clarke's general description and Franklin's identification as generally consistent with that description. See and compare *Commonwealth v. Jones,* supra.

Next, we must determine if Taylor's statement was the product of unnecessary delay between arrest and arraignment, *Commonwealth v. Futch,* 447 Pa. 389, 290 A. 2d 417 (1972); Pa.R.Crim.P. 130, or if it was involuntarily given. We conclude not.

■■■ It is well-established that the relevant time period when analyzing a *Futch* claim is that between arrest and the self-incrimination. *Commonwealth v. Rowe,* 459 Pa. 163, 327 A.2d 358 (1974). Hence, the relevant time period instantly is three hours, and less than two hours of this time was used in questioning Taylor and this includes the questioning during the polygraph examination. Such a short delay in arraignment is not in itself offensive to the ruling in *Futch.* See *Commonwealth v. Young,* 460 Pa. 598, 334 A.2d 252 (1975). See also, *Commonwealth v. Boone,* 467 Pa. 168, 354 A.2d 898 (1975); *Commonwealth v. Coley,* 466 Pa. 53, 351 A.2d 617 (1976).

■■ Taylor's argument that his statement was involuntarily given is premised on the assertion that he was suffering from withdrawal from narcotics. At the time he was questioned, Taylor told the police that he was an addict and had a shot of heroin the night before he was arrested. But the mere fact that a person is a user of narcotics does not render his statements involuntary. *Commonwealth v. Cornish,* 471 Pa. 256, 370 A.2d 291 (1977). Further, the suppression court found that Taylor appeared normal and alert during the crucial period. These findings are based on competent evidence and our standard of review requires that we accept this as a fact. So viewed, we cannot say Taylor's will was impaired by his drug intake at the time he incriminated

himself. *Commonwealth v. Cornish,* supra. See *Commonwealth v. Davenport,* 449 Pa. 263, 295 A.2d 596 (1972); *Commonwealth v. Smith,* 447 Pa. 457, 291 A.2d 103 (1972). It is true the hearing court also found that Taylor evidenced symptoms of drug withdrawal at or about the time of his arraignment, but this was some five hours after he initially incriminated himself and at least four hours after he signed the written statement.

Next, Taylor asserts that permitting use at trial of certain identification testimony warrants reversal. Prior to trial, defense counsel requested information from the Commonwealth concerning any possible pretrial identification testimony. Counsel was informed that, other than Clarke's identification of Taylor while testifying at the preliminary hearing, none was available. Based on this information, no pretrial motion to suppress identification testimony was filed.

At trial, the Commonwealth called Clarke, an eyewitness, who gave a general description[6] of the robber and identified Taylor as the guilty party. The Commonwealth then called Matthew Adams, another eyewitness and employee of the market, who also provided a general description[7] of the robber, but was unable to identify Taylor. The Commonwealth then called Frank Myers, another eyewitness and employee of the market, who testified that he had only a limited view of the robber, but observed he was wearing a "black cool cap" and sunglasses. Myers could not identify Taylor. The Commonwealth called Allen Nowak, another eyewitness and employee of the market, who provided a general

6. The description given at trial included general physical characteristics, i. e. short in height and medium build, and attire, i. e. a "cool cap" and mirror sunglasses. Additionally, Clarke admitted telling the police the perpetrator was clean-shaven, but could not recall at the time of trial whether the perpetrator was clean-shaven or not.

7. Adams stated he could not see the robber's face because of "dark shades" and a "cool cap." He also testified the felon was short and wore a gray or black jacket.

description [8] of the robber and identified Taylor as the perpetrator.

Prior to calling Nowak, the Commonwealth called Elbert Dale, an employee of the market, who testified that he entered the market while the robbery was in progress; that Jackson informed him a robbery was taking place; that he observed a young man telling Jackson to "get out of the way;" that he saw Jackson shot; and, that he was "90 per cent positive" the robber was Taylor. Dale then described the robber as having worn "shades" and a cap, and as being "five feet something" in height. During cross-examination, Dale testified that he did not know if the sunglasses were reflective or mirror type; that he could not see the felon's eyes; and, that he could only see his face from the glasses down. Further, Dale testified that he recounted the occurrence for police on the day of the crimes; that the police took notes; that he next saw Taylor at the preliminary hearing; that at the preliminary hearing, which he attended at the direction of the market owner who had conveyed the direction originally given by police, he (Dale) was asked by police if he could identify the robber; that he indicated he could; and, that he identified Taylor for the police. Dale also testified that the police did not indicate whom they suspected.

Following Dale's testimony, the jury was excused. Defense counsel asked to examine any written statement of Dale's account to the police on the day of the crimes. Detective Scanzello was called as a witness. He testified that he spoke with Dale at the scene of the crimes but did not record Dale's account. Scanzello was excused and the court then found as fact that no written statement or notes of Dale's account was taken.

8. Nowak stated the robber was a "male Negro, between the ages of 20 to 24 years of age, dressed in dark clothing, wearing reflective sunglasses . . ., wearing a hat of some sort, . . . short to medium [height]."

Defense counsel stated that he was "satisfied" and then moved for a suppression hearing to determine if Dale's identification testimony was "constitutionally infirm . . ., and if . . . it tainted any possible in-court identification . . .." The court granted the motion to conduct a hearing. Thereafter, the court, the Commonwealth, and defense counsel agreed to accept Dale's testimony during the trial as part of the record of the suppression hearing. Dale and Scanzello were then called as witnesses.

Scanzello testified that he notified the eyewitnesses of the preliminary hearing and directed them to be present; that he spoke with Clarke and Dale; that he asked them to be seated in the rear of the courtroom and to tell him if they saw the robber in the room; that six or seven preliminary hearings were conducted; that various individuals accused of crime were brought into the courtroom and seated in a row of chairs; that, as each of these individuals was "brought up," Clarke and Dale nodded in a negative fashion except when Taylor was "brought up," both then nodded affirmatively; that he then took Dale and Clarke out of the courtroom and asked each, separately, what they meant by nodding; that Clarke said he was positive Taylor was the robber; that Dale said he was 90 per cent sure; and, that he did not suggest to Clarke or Dale that Taylor was the guilty party.

Dale testified that while seated in the back of the courtroom during the preliminary hearing he recognized one individual brought into the courtroom as a person from his neighborhood and whom he described as "Popeye;" that, when Taylor was brought into the courtroom, he was seated on a bench next to Popeye; that only Taylor and Popeye were on the bench as far as he could remember; and, that he identified Taylor for Scanzello. Taylor did not testify at the preliminary hearing.

Arguments on the motion to suppress were then heard by the trial judge, and defense counsel argued that the procedure conducted by Scanzello was a line-up; that the Commonwealth had failed to show it was not impermissibly suggestive; and, that the identification testimony of Dale should be ordered suppressed. Counsel also stated that ". . . this goes to Mr. Clarke's identification also, if you want me to refer to that, too." The Commonwealth argued to the contrary and stated: "And, when you look back at the circumstances of Joseph Clarke—I know that's not an issue here." The court ruled the "identification . . ., which occurred at the preliminary hearing, was not the product of any improper procedure . . ." and ". . . did not constitute any taint upon the in-court identification." Fairly read, the court only ruled as to Dale's identification testimony, not Clarke's. Later in passing on post-verdict motions, a court en banc [9] ruled that both Clarke's and Dale's testimony was correctly admitted at trial stating that, even assuming Taylor was denied the right to counsel at the preliminary hearing line-up, the in-court identifications of Taylor by Clarke and Dale were of "a sufficiently 'independent origin' so as to be 'purged of the primary taint.'"

Taylor now asserts the admission into evidence of both Dale's and Clarke's identification testimony was error.

We shall first consider Dale's in-court identification testimony.[10] We agree with the trial court and

9. The opinion by the court en banc was authored by the trial judge who heard the evidence on the motion to suppress.

10. Since we reverse because of the admission of the in-court identification testimony, we need not pass on the admissibility of Dale's testimony as to his out-of-court identification of Taylor which was elicited in front of the jury during cross-examination, compare *Commonwealth v. Brown*, 462 Pa. 578, 342 A.2d 84 (1975), despite the fact that defense counsel had no prior knowledge or notice thereof. See *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Further, a reading of counsel's motion to suppress leaves considerable doubt as to whether

the court en banc that the procedure conducted by Scanzello was a line-up. Further, there can be no doubt that Taylor was effectively denied counsel at the line-up because, although counsel was present to represent Taylor at the preliminary hearing, he was not informed a lineup was being conducted. Accordingly, since Taylor was entitled to the effective assistance of counsel at the lineup [11] and since he did not waive that right, "primary illegality" stemming from the pretrial line-up was established. *Commonwealth v. Brown,* supra; *United States v. Wade,* 388 U.S. 218, 241, 87 S.Ct. 1926, 1939, 18 L.Ed. 2d 1149, 1165 (1967). Thus, the question of whether Dale's in-court identification testimony should have been suppressed, or in the context of this case the testimony struck or a mistrial declared, must be resolved by determining whether the Commonwealth met its burden of showing, by clear and convincing evidence, that the in-court identification had an "independent origin 'sufficiently distinguishable to be purged of the primary taint.' " *Commonwealth v. Brown,* supra at 589, 342 A. 2d at 90, quoting from *United States v. Wade,* supra, 388 U.S. at 241, 87 S.Ct. at 1939. See also *Commonwealth v. Cox,* 466 Pa. 582, 353 A.2d 844 (1976).

In determining whether the Commonwealth met its burden, we must consider various factors, including:

"the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual descrip-

counsel put the court on notice that the testimony recounting the pretrial identification was challenged.

11. The Commonwealth does not address the question of whether Taylor was entitled to counsel at the line-up; rather, it argues, in effect, that the line-up, if illegal, did not taint the in-court identification. But it could hardly argue to the contrary because the opinions filed by this Court in *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974), while differing over rationale, clearly indicate that Taylor had a right to counsel during the "line-up" under Pennsylvania law.

tion, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup."

*United States v. Wade*, supra, 388 U.S. at 421, 87 S.Ct. at 1940. [Footnote omitted.] Finally, since the court, which heard the evidence on the motion to suppress, found in favor of the Commonwealth, we must consider only the evidence presented by the Commonwealth and so much evidence presented by Taylor, as fairly read, remains uncontradicted. *Commonwealth v. Johnson*, supra.

So viewed the record establishes that Dale observed Taylor at the market for only a few minutes. Dale's ability to observe Taylor was obstructed because Taylor was wearing a hat and sunglasses. The sunglasses were a mirror type, that is, when looking at a person's face one would observe his own image and not the person's eyes and surrounding facial features. In sum, Dale could see only the lower portion of the felon's face. Thus, Dale's opportunity to observe Taylor during the criminal act was substantially limited.[12]

Dale never made a photographic identification of Taylor; he did not at any time identify anyone other than Taylor as the perpetrator; and, he never failed to identify Taylor. But these factors can be given little if any weight because, other than at the preliminary hearing line-up, the opportunity for any of these three events to occur did not arise.

12. We note that two other witnesses, Myers and Adams, had similar opportunities to observe the robber, but could not identify Taylor.

■ Although prior accounts by Dale describing Taylor were consistent with his in-court identification, the accounts were very limited in that they were not specific. There was no written account of Dale's description at the time of the crimes, but apparently he consistently mentioned a hat, sunglasses, a mustache,[13] and the same description of size. Dale at all times stated that he was only 90 per cent certain Taylor was the robber. Thus, while Dale's descriptions were consistent, since they were also very general and his identification testimony only "90 per cent" certain, little weight can be afforded this consistency. Compare *Commonwealth v. Crews*, 436 Pa. 346, 260 A.2d 771 (1970). On the other hand, only twelve days lapsed between the crimes and Dale's preliminary hearing identification, while five and one-half months lapsed between the preliminary hearing and the identification at trial.

■ The pretrial line-up was conducted in an even-handed manner in that Scanzello did not suggest that any particular person might be the guilty party, but Dale apparently knew one of the persons brought in by the court officials was suspected by the police, and no evidence was presented to show if any of the other persons from whom Dale was choosing were black and of small build as was Taylor and the robber. One of the persons from whom Dale was choosing, namely Popeye, was known to Dale. Thus, where no evidence exists to show otherwise, as is the case instantly, we can hardly conclude the pretrial identification was not suggestive, and that the Commonwealth has met its burden of so showing. This conclusion is even more compelling when we

13. There was a factual dispute at trial concerning the presence or absence of a mustache on the robber at the time of the crimes. Clarke testified that the perpetrator was clean-shaven. He indicated that by this he meant the perpetrator had no facial hair, but when questioned by the court Clarke said he (Clarke) was clean-shaven while testifying in the trial, when in fact he had a light mustache.

take note that Dale apparently sat next to Clarke during this line-up and what, if anything, transpired between them during this line-up is not of record. On this record, it is apparent Dale could see Clarke, and we cannot know whether Dale nodded affirmatively only after seeing Clarke do so or whether he did so independently of any suggestive action by Clarke.

We therefore rule that the Commonwealth has failed to establish the in-court identification had an independent origin. Compare *Commonwealth v. Cox,* supra.

Thus, the admission into evidence of Dale's in-court identification testimony constitutes error. Additionally, the error mandates reversal because it cannot be said that the error is harmless beyond a reasonable doubt. *Commonwealth v. Knight,* 469 Pa. 57, 364 A.2d 902 (1976). Although two other persons, Clarke and Nowak, identified Taylor at trial, their observations of the robber were also impaired by his attire, and thus the credibility of their testimony was at issue.[14] Also, although an incriminatory statement was introduced at trial, the voluntariness of it was challenged, and thus we cannot say whether the jury accepted or disregarded the statement in returning the verdicts.

Accordingly, the introduction into evidence of Dale's in-court identification testimony mandates the grant of a new trial.

There remains the question of whether Clarke's in-court identification testimony should have been admitted into evidence. We decline to rule on the question; rather, we believe that, under the circumstances, a fair resolution of this question can only be made following a suppression hearing during which the Commonwealth will be given the opportunity to show his testimony had an

14. Two other eyewitnesses, Myers and Adams, testified that they could not identify the robber, but provided general descriptions similar to the descriptions given by Clarke and Nowak.

independent origin. *Commonwealth v. Whiting*, 439 Pa. 205, 266 A.2d 738 (1970).

After Dale testified at trial, defense counsel moved to suppress his testimony; the motion, fairly read, did not include Clarke's testimony. But counsel cannot be faulted for not including Clarke's testimony because it was not until Scanzello testified in the suppression proceedings, and he was the last witness, that Clarke's participation in the pretrial line-up became known. Thereafter, defense counsel did include a challenge to Clarke's testimony in his argument to the court but did so only in passing and without clearly indicating it was at issue. Furthermore, it is apparent from reading the Commonwealth's argument at the time and the court's ruling that the passing reference did not put the Commonwealth or the court on proper notice. Thus, were we to now rule on the admissibility of Clarke's in-court testimony, we would, in effect, deny the Commonwealth the opportunity to show Clarke's testimony had an independent origin.[15]

On the other hand, to rule a waiver occurred would be unfair under the circumstances because defense counsel did not learn of Clarke's participation in the line-up conducted by Scanzello until Scanzello testified in the suppression proceedings, the Commonwealth failed to inform counsel of the pretrial line-up and identification,[16] and counsel did mention Clarke's testi-

15. We note that while Clarke participated in the same pretrial line-up as Dale, other facts with regard to Clarke's testimony which must be considered under the test of *United States v. Wade,* supra, remain unknown. Further, one significant factor is of record, namely that Clarke did testify at the preliminary hearing, and it must be considered along with other evidence to determine if Clarke's in-court identification testimony can be distinguished from Dale's.

16. The record establishes that the Commonwealth's attorney was also unaware of the pretrial line-up until cross-examination of Dale revealed it.

mony in argument even if he did not clearly put it at issue.

Accordingly, the judgments of sentence are reversed and a new trial is granted. Before retrial, defense counsel may file a motion to suppress Clarke's identification testimony.

ROBERTS, NIX and MANDERINO, JJ., concurred in the result.

JONES, former C. J., did not participate in the decision of this case.