432 A.2d 220

**COMMONWEALTH of Pennsylvania**

v.

**Alvin Chip WILEY, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 10, 1980.

Filed June 26, 1981.

398

Jesse E. Shearin, Jr., Greenville, for appellant.

David B. Douds, Assistant District Attorney, Mercer, for Commonwealth, appellee.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal from judgments of sentence for burglary[1] and theft by receiving stolen goods.[2] Appellant's principal argument is that the evidence of his identification was insufficient to support a finding of guilt beyond a reasonable doubt. We have concluded that we agree with this argument. We shall therefore reverse.[3]

1. 18 Pa.C.S.A. § 3502.

2. 18 Pa.C.S.A. § 3925.

3. This conclusion makes it unnecessary to consider appellant's other arguments, that the Commonwealth should not have been permitted

In considering the sufficiency of the evidence of appellant's identification, we regard the evidence and all inferences arising from it in the light most favorable to the Commonwealth. *Commonwealth v. Lewis*, 276 Pa.Super. 451, 419 A.2d 544 (1980); *Commonwealth v. Madison*, 263 Pa.Super. 206, 397 A.2d 818 (1979). We shall therefore ignore appellant's own testimony and that of his alibi witness.

At approximately 10:30 p. m. on May 1, 1979, Barbara Carnino was at work at the restaurant and tavern she owns in Farrell, Pennsylvania, when Herman Smith informed her that someone was in her apartment on the second floor over the restaurant. Carnino asked Phillip Craig, who was playing on a pinball machine, to accompany her upstairs to investigate. On the way upstairs, Carnino noticed that a police scanner radio and three bottles of whiskey had been removed from her apartment and left at the bottom of the stairway. Once upstairs, she found that her apartment had been ransacked—the dresser drawers thrown on the floor and the mattress disturbed. The back door to her apartment, leading to the roof and normally locked, was ajar, and a bedroom window was open. While she was examining the scene, a black male of medium build ran through her kitchen, down the hall, down the stairway, and out the front door. She saw him "[j]ust a couple of seconds," N.T. 4, and did not see his face. She believed, however, that he was one Butchy Deas, a black male whom she had employed in the past to clean her apartment, and who had access to it.

Phillip Craig testified that when he was in Carnino's apartment, he "[p]artially" saw the face of the individual who ran out. N.T. 22. He said he saw the individual "[a] few seconds," *id.* and that when the individual ran past him, he was four feet away. When asked who the individual was, he said it was appellant, whom he had then known for about six years. N.T. 23. When asked, "Did you make this identification to the Farrell police officers at the scene when they arrived?" Craig replied, "After about a few minutes after they arrived," N.T. 25. The following then ensued:

to plead surprise and impeach its own witness, and that the sentences imposed were excessive.

Q. Did you hear the name of Butchy Deas mentioned at all?

A. Yes.

Q. Who mentioned that name?

A. Barbara.

Q. Mrs. Carnino?

A. Yeah.

Q. Did you indicate—Did you say anything in response to that either to Mrs. Carnino or Captain Fetsko?

A. To Captain Fetsko.

Q. What did you tell Captain Fetsko?

A. That it might have been Chip Wiley instead of Butchy Deas.

Q. All right. Was it Butchy Deas?

A. (No response.)

Q. That you saw?

A. It could have been.

Q. Well, who was it? You said—You just testified that it was Alvin Wiley.

A. Well, at the time, you know, he come past me, you know, and it looked like Chip Wiley, and that's why I said Chip Wiley.

Q. Well, how positive are you in your identification?

MR. WHERRY: Object. Cross-examining or impeaching his own witness.

THE COURT: Overruled. You may answer.

A. Repeat the question.

THE COURT: How positive are you in your identification?

A. Not too sure.

Q. Did you testify that the individual that you saw in the apartment was Mr. Wiley at a preliminary hearing in this case?

A. Yeah.

Q. Did you tell the Farrell police officers that night, Captain Fetsko specifically, that it was Mr. Wiley who was in the apartment?

A. I said it might have been him. That's what I told him.

Q. Have you seen Mr. Wiley since this episode?

A. Yeah.

Q. Have you talked with him at all about this case?

A. No.

Q. Do you see the person today in this courtroom that you saw in the apartment that night?

A. Yes.

Q. Would you point him out, please.

(Defendant [*sic*] points.)

Q. Are you indicating the defendant, Mr. Wiley?

A. Yeah.

Q. All right.

MR. BELL: You may examine.

N.T. 25–27.

On cross-examination, Craig testified:

Q. Now, then a figure ran by you. Is that right?

A. Yeah.

Q. Okay. Mrs. Carnino said it was, called out, Butchy Deas. Is that right?

A. Yeah.

Q. All right, and you thought that it was Butchy Deas, or did you think that it was somebody else?

A. I had to think about it for a few minutes there.

Q. All right. Now, are you—To what degree of positive-ness are you able to say that the person who ran past you in that apartment at about 10:30 or 10:40 that night is my client, Alvin Wiley? How sure are you of this?

A. About 50 percent.

Q. So, you're 50 percent sure and 50 percent unsure.

A. Yes.

MR. WHERRY: No further questions.

N.T. 29.

On redirect examination, Craig testified:

Q. Do you recall, Mr. Craig, if you had any difficulty or any hesitation in identifying Mr. Wiley as the man you

saw in the apartment that night at the preliminary hearing when you were under oath and under examination?

A. No.

Q. You had no difficulty in identifying Mr. Wiley?

A. No.

Q. Is there anything that has happened since that time, since May 11, 1979, up until the present time that causes you to change your identification of the—positiveness of your identification of Mr. Wiley as the man you saw in the apartment?

A. Yes.

Q. What is that?

A. Some things that—about Butchy Deas.

Q. Could you explain that?

A. He has been involved in things.

Q. Isn't it a fact that when Mrs. Carnino indicated at the scene that she thought that it was Butchy Deas who ran out the door, you talked to Captain Fetsko and told him that it was not Butchy Deas who ran out the door, that it was this defendant? Isn't that a fact.

A. Yeah.

Q. All right. Did you have the understanding after May 1, 1979, after your interview by Captain Fetsko of the Farrell police and up to and beyond and after the preliminary hearing at District Justice Tamber's office that there were criminal charges filed against Mr. Wiley on this incident? Were you aware of that?

A. Yes.

Q. And you understood that, and you understood that he was charged with burglary and theft?

A. Uh huh.

Q. Arising out of this incident at Barbara Carnino's?

A. Yes.

Q. All right. And you had that understanding at the time you testified at the preliminary hearing at District Justice Tamber's?

A. Yes.

Q. Is that fair to say?

A. Yeah.

Q. Now, what is your testimony today as to who you saw in that apartment?

A. Well, since then I had a lot of time to think about it.

Q. You didn't have time to think about it that very evening when Captain Fetsko arrived at the apartment within what a matter of minutes after this fellow had left? Did you have time to think about it then?

A. Not really.

Q. It happened rather quickly. Is that fair to say?

A. Quickly. Yeah.

Q. And you heard Butchy Deas's name mentioned, and you told the police that it was not Butchy Deas.

A. (No response.)

Q. You told Captain Fetsko that at Mrs. Carnino's apartment.

A. Yeah.

Q. Who was it that was in the apartment?

A. I told him who it was.

Q. Now, tell me today—Tell us today who did you see in the apartment.

A. Chip Wiley.

Q. Now, on what do you base that? Why are you telling us today that it was Chip Wiley in the apartment that you saw?

A. That's what I seen.

Q. You saw him?

A. Yeah.

Q. Are you sure it was Chip Wiley?

A. Yeah.

Q. We have no further questions.

N.T. 34–36.

On re-cross examination, Craig testified:

Q. You said 50–50 before. Have you changed your mind that you're 50–50?

A. Yeah.

Q. Okay, now, where's the percentage now?

A. It's somewhere—It's about 70 percent.

Q. About 70 percent at this stage?

A. Yeah.

N.T. 37.

Also on re-cross examination:

Q. And your testimony now is that you're about 70 percent sure. Is that right?

A. Yeah.

Q. Where are you on the other 30?

A. I don't know.

THE COURT: I'm sorry. I don't understand that question.

A. I don't understand it either.

Q. Are you unsure on the other 30 then?

A. Yeah.

Q. All right.

N.T. 39.

In considering whether this evidence was sufficient to permit the jury to find beyond a reasonable doubt that appellant was the man who broke into Barbara Carnino's apartment, we have found no case squarely on point. We therefore must state our analysis step by step.

The hazards of identification testimony are most often discussed in cases in which the issue is whether the testimony is tainted by some suggestive pre-trial procedure, such as a line-up. *See, e. g., United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In such cases the concern is to ensure that the testimony has a basis independent of the suggestive procedure. *See e. g., Commonwealth v. Taylor,* 472 Pa. 1, 370 A.2d 1197 (1977). In deciding whether the testimony does have such a basis, the court will consider all of the circumstances, as, for example, whether the witness had a good opportunity to view the suspect; how positive the witness's identification was; whether the witness had at some point identified someone else; how suggestive the pretrial procedure was; and so on. In *Commonwealth v.*

*Taylor, supra,* the Court undertook such a consideration, and concluded that the Commonwealth had failed to prove that the witness's identification testimony had a basis independent of the suggestive pre-trial procedure. The same conclusion was reached in *Commonwealth v. Fowler,* 466 Pa. 198, 352 A.2d 17 (1976). In *Commonwealth v. Cox,* 466 Pa. 582, 353 A.2d 844 (1976), in contrast, the Court concluded that the Commonwealth had proved an independent basis.

Cases such as these are pertinent to our decision here, for they emphasize the hazards of identification testimony, and illustrate situations in which those hazards have, or have not, been overcome. Their enumeration of the factors to be considered in evaluating the strength of identification testimony is helpful in evaluating the testimony here. This said, however, the cases must be put to one side, for they are different from the present case in one critical respect. In all of them there was a suggestive pre-trial procedure of some sort. Given the consequent danger that the Commonwealth had by its conduct *planted* a mistaken identification in the mind of the witness, it was the Commonwealth's burden to prove "by clear and convincing evidence that the totality of circumstances affecting the witness's identification did not involve a substantial likelihood of misidentification." *Commonwealth v. Fowler, supra,* 466 Pa. at 203, 352 A.2d at 19 (citing cases). Here, no suggestive pre-trial procedure occurred. Craig spontaneously informed the police that the burglar was appellant, and he did so despite Barbara Carnino's belief that it was Butchy Deas. No police officer exhibited appellant to Craig in a show-up or line-up, or showed Craig a photograph of appellant, or otherwise suggested to Craig that appellant was the burglar. This being so, the Commonwealth's burden was not so heavy as in cases such as *Taylor, Cox,* and *Fowler,* but instead was "simply to introduce evidence solid enough to avoid conjecture." *Commonwealth v. Hurd,* 268 Pa.Super. 24, 33, 407 A.2d 418, 422 (1979).

The principle that a verdict may not rest on conjecture is, of course, of general application, and not limited to cases of

possible misidentification. For example, in *Commonwealth v. Rex*, 147 Pa.Super. 121, 24 A.2d 98 (1942), this court reversed a judgment of sentence for bastardy when the prosecuting witness admitted to frequent sexual relations with five men other than the defendant, and where "[a]lmost every definite statement made by her . . . is contradicted elsewhere in her testimony . . . ." *Id.,* 147 Pa.Super. at 123, 24 A.2d 98. We said:

> In the interests of the liberty of the citizens a court may and, in a proper case, should declare the evidence insufficient to convict. [Citations omitted.] A jury cannot be permitted to guess.

*Id.,* 147 Pa.Super. at 124, 24 A.2d 98.

Similarly, in *Commonwealth v. Bennett,* 224 Pa.Super. 238, 303 A.2d 220 (1973), we reversed a judgment of sentence for receiving stolen goods where the prosecuting witness "[w]ith each new version . . . would recant the previous one and protest that the newest version was in fact the true one." *Id.,* 224 Pa.Super. at 240, 303 A.2d at 220–21. This presented a situation, we held, where "any finding by the jury would be a mere guess . . . ." *Id.* quoting *Commonwealth v. Bartell,* 184 Pa.Super. 528, 537, 538, 136 A.2d 166, 172 (1957).

In deciding whether the jury's verdict here was more than a guess, we have found three cases particularly helpful. In *Commonwealth v. Crews,* 436 Pa. 346, 260 A.2d 771 (1970), our Supreme Court granted a motion in arrest of judgment of sentence for first degree murder on the ground that "[t]he jury was forced to guess whether [the murderer] was Crews or another light-complexioned Negro male wearing a gold sweater who committed the crime." *Id.,* 436 Pa. at 349, 260 A.2d at 772.

> [T]he Commonwealth's sole identification evidence was based on similar height and coloration, plus the clothing. In light of the myriads of people who fit the height and coloration description, and in light of the commonness of a gold sweater and a black trench coat, the evidence failed to point with sufficient certitude to Crews as the perpetrator of the crime.
> *Id.*

In contrast to this decision, in *Commonwealth v. Mason*, 211 Pa.Super. 328, 236 A.2d 548 (1967), and *Commonwealth v. Hurd*, 268 Pa.Super. 24, 407 A.2d 418 (1979), this court found the evidence of identification sufficient. In *Mason* the lower court had sustained the defendant's demurrer to the evidence. In reversing and remanding for trial, we recognized that the identification witness "was only ninety percent sure of his identification" at the preliminary hearing, 211 Pa.Super. at 331, 236 A.2d at 550. We noted, however, that "at the trial he was one hundred percent sure," *id.*, and that in addition there was circumstantial evidence that corroborated his identification.

> Identification [we said] need not be positive and certain in order to convict, but need only constitute proof beyond a reasonable doubt. *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954). Any indefiniteness and uncertainty in the identification testimony goes to its weight.
> 211 Pa.Super. at 332, 236 A.2d at 550.

In *Hurd* the witness testified, "I am not positive, but I believe that is him." 268 Pa.Super. at 31, 407 A.2d at 421. On redirect, she testified that she was "about 95 percent sure" of her identification. *Id.* It further appeared that at a pre-trial line-up she had at first identified not the defendant but someone else. In upholding the conviction, we stated that "[the] identification testimony was not so contradictory as to make it conjectural." 268 Pa.Super. at 32, 407 A.2d at 422. In explaining this conclusion, we referred to several facts in particular. The witness had watched the robber closely during the five minutes he was in the store, where the lighting was good. The witness explained what happened at the lineup by saying that when she at first failed to identify the defendant as the robber, she was standing too far away—30 to 35 feet; when she asked for a second look, and stood only 5 feet away, she identified the defendant. In identifying the defendant at trial, the witness referred to specific characteristics that made her believe that the defendant was the robber—his mustache and a

dimple in his chin. The witness further testified that she recognized the defendant as the robber by his build, his voice, and his fist.

After reflecting upon these cases, we have concluded that the present case is a good deal closer to *Crews* than it is to *Mason* or *Hurd*, and that in deciding that appellant was the burglar, the jury had to guess.

Initially, we note the absence, as in *Crews*, of any evidence, circumstantial or other, corroborating Craig's identification of appellant. In *Mason*, for example, the police saw the defendant (whose identification the witness was only ninety percent sure of) following the victim's car. Here there is no comparable evidence, *e. g.*, that appellant had ever been in the Carnino restaurant, or lived nearby, or was found in possession of anything stolen from the apartment. Thus, proof that appellant was the burglar rested entirely on Craig's identification.

Next, we note that in appraising Craig's identification, the jury had to decide how to reconcile it with Barbara Carnino's identification of the burglar as Butchy Deas. It is plain from the verdict that the jury accepted Craig's, and rejected Carnino's, identification. We are not troubled by this choice, however, for we do not believe that in making it, the jury had to guess. Carnino testified that she had not seen the burglar's face, and had only assumed that the burglar was Butchy Deas because Deas had access to her apartment. N.T. 4, 18. When asked, "Was there any similarity in build or anything like that?," she replied, "Just he was colored and running down the hall." N.T. 18. She was unable to state the burglar's approximate age, and could only describe his build as "medium." N.T. 4. Craig, on the other hand, testified that he had "[p]artially" seen the burglar's face, N.T. 22, and that he had as of that time known appellant for "[a]bout six years," *id.*

What does trouble us, however, is whether Craig's identification, although preferable to Carnino's, was itself of sufficient strength to support a finding that it was correct beyond a reasonable doubt. If not contradicted by Carnino's identification, neither was it corroborated by it. This is

perhaps not quite so, for Carnino did say that the burglar was a black male; but this description is so general as not to amount to corroboration of any consequence. *Cf. Commonwealth v. Crews, supra* ("myriads of people ... fit the height and coloration description").

Upon examining Craig's testimony, one is inescapably reminded of the witness in *Commonwealth v. Bennett, supra,* who "would recant the previous one and protest that the newest version was in fact the true one." To recapitulate Craig's testimony, which we have quoted above: On direct examination, he identified appellant as the burglar, but never either positively or consistently. He started by saying that the burglar "was" appellant. N.T. 23. Then, almost at once, he contradicted himself, saying that "[i]t could have been [Butchy Deas]." N.T. 25. Then he contradicted his contradiction, saying that "it looked like [appellant]," *id.,* and pointing to appellant as the person he saw in the apartment. N.T. 26. On cross-examination, he said he was only "about 50 percent sure" that the burglar was appellant. N.T. 29. On re-direct examination, which, it will have been observed, was as on cross-examination,[4] he ended by answering, "Yeah," to the question, "Are you sure it was Chip Wiley?" N.T. 36. This was the first, and only, time he made a positive identification of appellant. He immediately took it back on re-cross examination, answering that he was "[u]p and down sort of," N.T. 37, and ending by saying that he was "about 70 percent" sure, N.T. 37, 39.

This testimony was very different from that in *Commonwealth v. Mason, supra,* where the witness, while only ninety percent sure of his identification at the preliminary hearing, was positive at the trial, and from that in *Commonwealth v. Hurd, supra,* where the witness, while admitting at trial that she was not "positive" in her identification, never waivered in her testimony that she "believed" her identification to be correct, and was "about 95 percent sure." So far as we can see, the jury here was left with a choice between only two alternatives: Either it could find that Craig was, as he said

4. The prosecutor had pleaded surprise, and was permitted to cross-examine Craig. *See* note 5, *infra.*

he was, doubtful of his identification of appellant as the burglar. Or it could find that he was not doubtful but for some reason was only pretending to be.

If the jury found that Craig was doubtful of his identification of appellant as the burglar, then it too had to be doubtful. For it had no other evidence to go on. Carnino had believed that the burglar was Butchy Deas; and no evidence besides Craig's identified or even pointed to appellant as the burglar.

■ We must therefore suppose that although Craig testified that he was doubtful of his identification of appellant as the burglar, the jury found that in fact he was not doubtful. On this supposition, the question becomes, "On what, then, did the jury base its verdict of guilty?" It was, of course, entitled to disbelieve Craig when he said he was doubtful; it could decide on the basis of Craig's demeanor that he was only pretending to be doubtful—that in fact he was sure appellant had been the burglar, and that something, unknown to the jury, had happened between the time of his identification of appellant as the burglar and the time of trial to cause him to testify as he did.[5] A verdict, however, cannot rest on *dis* belief; there must be evidence that if *believed*, is strong enough to support a finding of guilt beyond reasonable doubt.

**5.** The record discloses that in fact something had happened between Craig's identification of appellant to the police and the trial, which might have affected Craig's testimony. When the prosecutor pleaded surprise and asked leave to cross-examine Craig, a side-bar conference ensued. Defense counsel told the court that that morning Craig had come to his office to say that "he believes he mis-identified Mr. Alvin Wiley." N.T. 31. Counsel told Craig that he should "tell the District Attorney this and not me," *id.*, and took Craig to the prosecutor's office. The prosecutor told the court that Craig had told him that "it could have been Alvin Wiley, it could have been Butchy Deas, and it could have been someone else." N.T. 32. The prosecutor went on to tell the court that he had reminded Craig of his prior testimony at the preliminary hearing and his statements to the police at the scene, identifying appellant as the burglar, *id.*; that he had "mentioned [to Craig] that it was serious business of *[sic]* accusing someone if you didn't have any solid basis to do that," N.T. 32–33; that he had also "advised him [Craig] that if there was any evidence to indicate that he testified falsely at the preliminary hearing or was testifying or was talking to us falsely that he could be charged with

■ The only evidence that if believed, could possibly support the verdict is the evidence that when on the scene and again at the preliminary hearing, Craig identified appellant. Before we can consider this evidence it is important to note exactly what question it required the jury to resolve. The question was not whether, when he identified appellant on the scene and at the preliminary hearing, Craig was *sure* he was right (and, therefore, was lying when he testified at the trial that he was not sure). The question, rather, was whether, when he identified appellant on the scene and at the preliminary hearing, Craig was *right*, and was so *plainly right* that the jury was entitled to say that it had no reasonable doubt of appellant's guilt.

In considering this question, it should first be noted that the evidence that Craig had identified appellant at the preliminary hearing was of little, if any, consequence. So far as appears from the record, Craig did not see appellant between the time of the burglary and the preliminary hearing, and learned nothing during that time regarding the burglary that he did not know when he identified appellant to the police on the scene. At the preliminary hearing, therefore, Craig was simply repeating the identification he had made on the scene. If his original identification was weak, the weakness was not removed by Craig's repetition.

When one examines the evidence of Craig's original identification of appellant to the police on the scene, one is compelled to conclude that it was indeed weak.

Perhaps the most striking weakness in Craig's identification of appellant as the burglar is the limited opportunity Craig had to observe the burglar. He saw the burglar "[a] few seconds," N.T. 22, "running past me," N.T. 21; as the

perjury and obstruction of justice and false reports to law enforcement officers," N.T. 33; that he told Craig that he "understood that it wouldn't be an easy situation to be in, and he [Craig] probably knows Mr. Wiley, and he is probably a friend or an acquaintance," and asked Craig "to think about it again," *id.*; and that Craig then said that "he would stick with his original story, and that it was Mr. Wiley who he saw in the apartment," *id.* The jury was not informed of any of this.

burglar ran past, he came within four feet of Craig, N.T. 22, and Craig saw his face "[p]artially", *id.* The evidence does not disclose how directly, or squarely, Craig was looking at the burglar as the burglar ran past. Craig only said, "As I turned around, I seen something running past me," N.T. 21. Nor does the evidence disclose what were the lighting conditions. Barbara Carnino testified that her kitchen and bedroom were "fully lit" but that there was "[j]ust a small light in the hall." N.T. 15. Craig indicated that he was in "the back room" of the apartment when he "turned around" and saw "something running past me." N.T. 21. Apparently the back room was not the bedroom, for Craig also indicated that he had proceeded from the bedroom into the back room. No one described the back room or its lighting. Finally, the evidence does not disclose how "partially" Craig saw the burglar's face. What part of the burglar's face, and how much of that part?

Again, Craig's testimony is very different from that in *Commonwealth v. Hurd, supra.* There the evidence disclosed that the witness had watched the robber closely during the five minutes he was in the store, where the lighting was good. Also, there the witness explained why she was ninety-five percent sure the defendant was the robber; she testified that she recognized the defendant as the robber by his mustache and dimple, his build, his voice, and his fist. Craig, in contrast, was unable to offer—or at least, he did not offer—any such explanation. The closest he got to detail was to say that the burglar "had a brown coat and a black hat," N.T. 24, and this detail did not in any way provide a link between the burglar and appellant, for Craig also said that he had never seen the burglar's coat and hat on appellant, *id.*

We have not overlooked Craig's testimony that at the time of the burglary, he had known appellant "[a]bout 6 years." N.T. 23. This, however, could not shore up the manifold weaknesses in Craig's identification of appellant. The evidence does not disclose how well Craig had known appellant, or how often he saw him, or when he had seen him last, or any similar information; only that he had "known" appel-

lant. *Id.* It is a common experience, which all of us have had, to think we recognize someone, perhaps someone we know well and have seen often and recently only to discover that we were mistaken.

It is of course *possible* that Craig's identification on the scene of appellant as the burglar was in fact correct—that he saw enough of the burglar's face, in light good enough and for a long enough time, and knew appellant well enough, to recognize the burglar as appellant. However, it is *also possible* that all or some of these things did not occur—that he saw the burglar so briefly, and saw so little of the burglar's face, as to be unable to see any distinctive features; that the light was dim; and that he knew appellant only casually and had not seen him recently. Comparison of these possibilities suggests that if anything, the second is more likely than the first; that would explain Craig's evident inability to supply any detail providing a link between appellant and the burglar. But however this may be, it was the Commonwealth's burden to enlighten the jury with respect to the circumstances of Craig's identification, as for example, the Commonwealth did in *Commonwealth v. Hurd, supra.* Without enlightenment, the jury was unable to appraise the worth of the identification. It could, as we have remarked, rejected Craig's testimony that he was not sure of his identification. It could then ask itself why, when Craig identified appellant to the police, he had been sure enough to make the identification. But having asked this question, the jury could not answer it, not, that is, on the basis of the evidence. It could *guess* that Craig had had sufficient opportunity, and so on, to make a correct identification. But it could only guess.

Reversed.

WICKERSHAM, J., files a dissenting opinion.

WICKERSHAM, Judge, dissenting:

I dissent.

The appellant, Alvin Chip Wiley, was convicted by a jury of his peers of burglary and theft by receiving stolen goods.

414

The jury was properly instructed that they were required to find evidence supporting such conviction beyond a reasonable doubt. Part of the Commonwealth's evidence pertained to identification testimony. The jury heard the identification evidence and resolved the issue of the witness's credibility under proper legal instructions from the trial judge.

Now comes the majority of this Panel of the Superior Court of Pennsylvania and determines in their wisdom that the jury could not have found as they did. The trial judge after hearing post-verdict motions affirmed the jury action.

I do agree with that limited portion of the majority opinion, page thirteen, which reads as follows:

> Here, no suggestive pre-trial procedure occurred. Craig spontaneously informed the police that the burglar was appellant, and he did so despite Barbara Carnino's belief that it was Butchy Deas. No police officer exhibited appellant to Craig in a show-up or line-up, or showed Craig a photograph of appellant, or otherwise suggested to Craig that appellant was the burglar. This being so, the Commonwealth's burden ... was 'simply to introduce evidence solid enough to avoid conjecture.' (citations omitted).