352 A.2d 17
COMMONWEALTH of Pennsylvania, Appellee,
v.
Clarence FOWLER, Appellant (two cases).

Supreme Court of Pennsylvania.
Argued May 3, 1974.
Decided Jan. 29, 1976.
Rehearing Denied March 5, 1976.

200

Louis Lipschitz, Lipschitz & Danella, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Richard A. Sprague, First Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., James Garrett, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION

MANDERINO, Justice.

The appellant, Clarence Fowler, was convicted by a jury on November 9, 1972, of murder in the first degree, conspiracy, aggravated robbery, and burglary. Post-ver-

dict motions were denied, and appellant was sentenced to life imprisonment for murder, and to a concurrent term of ten to twenty years imprisonment for aggravated robbery and burglary. Sentence was suspended on the conspiracy conviction. Appropriate appeals followed to this Court and to the Superior Court. The appeals in the Superior Court were then certified to this Court.

Appellant's prosecution resulted from the killing of Reverend Clarence Smith. On May 18, 1970, Reverend Smith was shot and killed in his Philadelphia home in the presence of his daughter, Mrs. Beulah Hopewell. In a motion to suppress prior to trial, appellant sought to prevent the introduction of identification evidence. That motion was denied, and at trial the witness Hopewell identified appellant as one of two men involved in the crime. The second man has never been identified. The failure to suppress the identification evidence was assigned as error in post-verdict motions and again in this appeal. We agree that the identification evidence should have been suppressed because its use denied appellant due process of law. *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Appellant contends that the trial court "erred in failing to suppress identification evidence which was the result of impermissible suggestion arising from pre-lineup displays of photographs of the appellant and the line-up itself." He argues that the photographic identification procedure employed by the police prior to a chance encounter in a restaurant, at which the victim's daughter "recognized" appellant, created a substantial risk that what she "recognized" was the image that had been cre-

ated in her mind by the photographic identification procedure *after* the crime and not the image of the person she saw momentarily in her father's home. Appellant argues that the repeated display of his photograph to the victim's daughter in a manner which called attention to the photograph was unnecessarily suggestive making the daughter's "recognition" at the restaurant "all but inevitable." *Foster v. Califoria*, 394 U.S. 440, 443, 89 S.Ct. 1127, 1129, 22 L.Ed.2d 402, 407 (1969). Appellant further argues that a line-up identification made two weeks after the chance encounter, and following yet another suggestive photographic identification procedure, involved even more risk of misidentification than was inherent in the daughter's earlier "recognition." Since the pretrial identifications involved a substantial risk of misidentification at trial, appellant contends that the daughter should not have been permitted to identify him in court. We agree.

 Following a suggestive pre-trial identification procedure, a witness should not be permitted to make an in court identification unless the prosecution establishes by clear and convincing evidence that the totality of the circumstances affecting the witness's identification did not involve a substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d at 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Wade*, 388 U.S. 218, 88 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States ex rel. Thomas v. State of New Jersey*, 3 Cir., 472 F.2d 735 (1973); *United States v. Holiday*, 3 Cir., 457 F.2d 912 (1972).

 Whether the daughter's identification of the appellant at trial involved a likelihood of misidentification cannot be determined by considering the in-court identification in a vacuum. Trial testimony identifying one as the person observed at the time of a crime is a

one-on-one confrontation involving circumstances even more suggestive than those present at pretrial one-on-one confrontations. During the trial, the identifying witness knows that the defendant present in the courtroom has been accused, arrested, and is being tried for the crime. Prior to trial, such circumstances may not yet have occurred or may not yet be known to the witness. Thus, the testimony of a witness who will point an accusing finger at the defendant during the trial, should be prohibited unless the prosecution establishes by clear and convincing evidence at a suppression hearing that the witness's proposed trial identification will be reliably based on the witness's observation at the time of the crime, and that the identification was not induced by events occurring between the witness's observations at the time of the crime and the witness's in-court identification. Whether the prosecution has met its burden requires a consideration of the totality of the circumstances. *Neil v. Biggers, supra; Simmons v. United States, supra.*

■ A consideration of the totality of the circumstances requires a close examination of (1) the suggestive factors involved in the identification process, and (2) whether or not, despite the suggestive factors involved in the process, other factors are present which clearly and convincingly establish that the witness's identification has an "independent origin" in the witness's observations at the time of the crime. *United States v. Wade,* 388 U. S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149, 1166 (1967); *Commonwealth v. Burton,* 452 Pa. 521, 523, 307 A.2d 277, 278 (1973).

The dangers involved in the photographic identification process were clearly pointed out in *Simmons v. United States,* 390 U.S. at 383–384, 88 S.Ct. at 971, 19 L.Ed. 2d at 1253 (1968):

"It must be recognized that improper employment of photographs by police may sometimes cause witnesses

to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or *if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.* The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. *Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."* (Emphasis added.)

In *Simmons*, federal investigators showed group photographs of petitioners (and others) to five bank employee witnesses to the robbery. These group photographs (at least six in number) were shown to each of the five bank employees individually on the day following the robbery. Each of the five witnesses picked the petitioner Simmons from the group as one of the perpetrators of the crime. *Simmons* concluded that "the identification procedure employed may have in some respects fallen short of the ideal." *Id.* at 385–386, 88 S.Ct. at 972, 19 L.Ed.2d at 1254. Despite this conclusion, *Simmons's* analysis of the other factors showed that there was little chance of misidentification. *Simmons* pointed out that the witnesses each had a good view of the robbers (the bank was well lighted; the robbers wore no masks, the period of time

the various witnesses saw the robbers ranged up to five minutes); the witnesses had made positive photographic identifications of Simmons one day later while their memories of the event were still fresh; all five witnesses identified Simmons's photograph as that of one of the robbers; and none of the witnesses expressed any doubt about their respective identifications.

In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L. Ed.2d 401 (1972), the Court reviewed the "general guidelines" that had been developed by it in the four previously decided suggestive identification procedure cases, *See Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Simmons v. United States, supra; Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), and *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). *Neil* concluded, as did *Simmons*, that despite the suggestiveness of an identification process, the presence of other factors could indicate that the identification was reliable. *Neil v. Biggers* addressed itself to "the factors to be considered in evaluating the likelihood of misidentification," and concluded that consideration should be given to

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation and the length of time between the crime and the confrontation."

*Id.* 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.

Applying these factors to the challenged identification, *Neil v. Biggers* emphasized that although the identification was made seven months after the incident—the Court noted that "[t]his [time lapse] would be a seriously negative factor in most cases"—the chance of misidentification was small because the witness had "spent a considerable period of time with her assailant, up to half an hour," under "adequate artificial light in her house

and under a full moon outdoors" and "faced him directly and intimately." Furthermore, her description of the assailant was "more than ordinarily thorough" and when she first identified the defendant at the showup, she had " 'no doubt' that respondent was the person who raped her." (*Id.* 409 U.S. at 200–201, 93 S.Ct. at 382, 34 L. Ed.2d at 412.) *Neil v. Biggers,* of course, involved an allegedly suggestive "showup" procedure, however, the factors to be considered when evaluating an alleged denial of due process resulting from a suggestive photographic identification procedure are the same. *See Simmons v. United States, supra,* and *United States v. Higgins,* 458 F.2d 461 (3d Cir. 1972).

*United States v. Higgins,* 458 F.2d 461 (3d Cir. 1972), set forth and applied criteria similar to *Neil v. Biggers, supra*:

"in [*United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)], and discussed by Chief Judge Seitz in *Zeiler II* [*United States v. Zeiler,* 447 F.2d 993 (3d Cir. 1970)]: (1) the manner in which the pretrial identification was conducted; (2) the witness' prior opportunity to observe the alleged criminal act; (3) the existence of any discrepancies between the defendant's actual description and any description given by the witness before the photographic identification; (4) any previous identification by the witness of some other person; (5) any previous identification of the defendant himself; (6) failure to identify the defendant on a prior occasion; and (7) the lapse of time between the alleged act and the out-of-court identification."

*Id.* at 465.

Applying these factors to uphold the admissibility of the photographic identification, the *Higgins* court concluded that there was no suggestiveness in the procedure that could have led to a misidentification. The court noted that the witness "was able to observe the robber

under circumstances favorable to clear perception," from a distance of 30 to 40 feet, for a period of a full minute to a minute and a half, the witness gave a complete and accurate description of the robber shortly after the incident; the witness had never failed to identify the defendant's photograph, nor had he ever incorrectly identified anyone else; the witness made two photographic identifications of the defendant prior to his in-court identification; the time lapse between the robbery and the first photographic identification was three and one-half months. The witness, however, had been shown various groups of "mug shots" from the day following the robbery, and it was not until three and one-half months later that the defendant's photograph first appeared.

In *United States v. Coades*, 468 F.2d 1061 (3d Cir. 1972), the *Higgins* factors were applied, and the photographic identification upheld despite the witness having been repeatedly shown photographs of the defendant. The court stated,

> "We have no doubt that *repeated viewings* of a defendant *can suggest* to a witness that *'this must be the man.'* In the totality of the circumstances here, however, we do not find a danger that the repeated viewings caused misidentifications. The absence of any proof that the witnesses ever identified other suspects or *failed to identify the Coades in the many photograph displays* and lineups, combined with the evidence that the *witnesses had good views during the crime and made accurate descriptions* of defendants before any viewings, convinces us that the identification testimony was properly admitted." (Emphasis added.)

*Id.* at 1063–1064.

In *United States v. Monteer*, 512 F.2d 1047 (8th Cir. 1975), the Court, although holding that the photographic

identification procedure was not impermissably sugges-
tive stated,

"But even assuming *arguendo* that the photographs
or lineups were in some way improper, we . . .
are convinced that [the witness's] in-court identifica-
tion of Monteer was not influenced in any respect by
the photographs or lineups.

. . . . . . . .

Here, [the witness] *saw Monteer* at close proximity
for approximately *five minutes* during the robbery and
she afterwards gave a *detailed and accurate descrip-
tion* of his build, facial features, and clothing. *At no
time* during the next day and a half *did she express
doubt* about her description of the robbers and *she
never failed to identify Monteer* when he appeared in a
lineup or a photographic display—a fact which en-
hances the reliability of her independent identification
and confirms that *she did indeed get a good look* at
Monteer during the robbery." (Emphasis added.)
*Id.* at 1050.

In *Government of the Virgin Islands v. Navarro*, 513
F.2d 11 (3d Cir. 1975), the court, expressly applying the
*Neil v. Biggers* criteria, upheld the district court's denial
of motions to suppress the in-court identification saying
that the two eyewitnesses to the incident had "an un-
impeded opportunity to view the individuals involved
. . . at close range during the course of the fist
fight and subsequent shootings." Furthermore, a third
witness had also "seen all defendants earlier in the day
at the park and thus had some familiarity with their
faces." The witnesses displayed "no lack of certainty"
in identifying the defendants. Finally, the identifica-
tions took place less than twenty-four hours after the in-
cident "thus insuring that the witnesses' memory of the
incident and of those involved was fresh." (*Id.* at 17–
18.)

These cases make clear that the issue raised cannot be properly resolved without a careful and detailed analysis of the totality of the circumstances affecting the witness's identification. The facts of this case are as follows.

At approximately 12:30 p. m., on May 18, 1970, Beulah Hopewell was seated at the table in the breakfast room of her father's home when the doorbell rang and her father answered it. She was reading the paper and having coffee and paid little attention to the voices she heard in the living room. Sensing the presence of someone near her, she "turned around" and saw a man in the doorway. He said "Don't look at me, cover your eyes." She "laughed" thinking it was a "joke." She "thought it was some of the boys coming from church" and said "okay, and turned around and covered [her] eyes." The man then said "Get up and come into the other room." As she got up, he said "Don't look at me," and "put his hand up over his face." As he did, she saw a gun in his other hand and "quickly closed [her] eyes again." Before doing so, she got a "momentary look" or "glimpse" of the man near her. She also saw another man standing in the living room with his back to her, and her father looking at a piece of paper. The man with her instructed her to lie on the floor. While lying facedown on the dining room floor she heard her father say, "you must be kidding, I have a sick wife upstairs." The man with her then said "Don't argue with the man, just shoot him." She heard shots and saw her father fall to the floor. She remained on the floor until after the men had fled. Later, she picked up the paper she had seen her father reading. It read "This is a stick up; be cool." As a result of the shooting, Reverend Clarence Smith died.

Later that day, the victim's daughter told the police what had happened and described the man near her as being of slender build, nineteen to twenty-one years old, approximately six feet tall, clean shaven, with medium

brown skin, wearing a dark suit, white shirt, small dark tie, dark straw hat and sunglasses.

That evening, as a result of an investigation independent of the daughter's statement, police questioned appellant for several hours. While at the police station, appellant consented to have his photograph and fingerprints taken. After the police concluded their interrogation, appellant was released.

During the next three months, the victim's daughter was repeatedly shown groups of photographs to see if she could identify anyone as the man who was in her father's home. She was shown hundreds of photographs generally in groups of ten to twenty. She testified that "many times" appellant's picture was included in the groups of photographs displayed to her by the police. She could not say exactly how many times because she had not "kept a record." She said that each time appellant's picture was included in a group of pictures shown to her, she "held his photograph out" because, although appellant looked much older, he resembled the man she had seen in her father's home. She "thought the person [in her father's home] was a much younger looking person." During this period, she was unable to identify any of the photographs, including appellant's, as being of the man who was involved in the crime.

The record establishes that the daughter was interviewed on numerous occasions between May 18, 1970 and August 13, 1970. It is not clear from the record how many times she was shown appellant's picture. The prosecutor admitted at trial that "there are not records in existence to the best of my knowledge as to the photographs shown to her on any occasion when there was no identification, and that includes those occasions on which Fowler's photograph was shown to her and she failed to identify it." Despite the lack of complete records, the defense was able to establish through prosecution witnesses at least three of the occasions when she was

shown appellant's picture prior to August 13, 1970. She was first shown appellant's picture on May 19, 1970, one day after the killing. At that time, she was shown eight photographs. Six of these were police mug shots showing both front and side views from the chest up. The other two photographs differed significantly from the six. One of these was a photograph of appellant. His photograph was not a mug shot and no markings of any kind appeared on it. There was nothing to distinguish it from an ordinary picture. Appellant, unlike the persons in any of the other photographs, appeared in a full-length front view wearing a dark suit, white shirt and tie. The second display of photographs in which appellant's picture appeared took place three days later on May 22, 1970. At that time, thirteen photographs were displayed. Again eleven of the thirteen photographs differed significantly from the two others, one of which was a photograph of the appellant. Eleven of the photographs were mug shots. Appellant's photograph depicted him in the same pose as did the photograph shown on May 19, 1970. The third display of photographs took place sometime after May 22, 1970, but the exact date could not be tied down by the officer who displayed the photographs. He said, however, that he did not enter the case for several months. Thus, this display probably took place in late July or early August of 1970. On that occasion, the daughter was shown eleven photographs, at least nine, and maybe all but one of which as before, differed from two of the other photographs, one of which was the appellant. Furthermore, appellant was shown in a polaroid photograph, which was different from all the other photographs.

Following this three month period, on August 13, 1970, the victim's daughter saw appellant in a chance encounter at a Howard Johnson Restaurant in New Jersey. Along with her husband and mother, she had stopped at the restaurant en route to New York. Appellant and two

other men entered the restaurant together and sat on the opposite side of the counter close enough to the daughter to enable her to hear him speaking to his companions. She said that his voice sounded immature and at one point she heard him say to one of his companions "that is the wife and daughter, and she doesn't recognize me." Appellant and his companions left the restaurant first. They were about to get into their car, when the daughter saw them again and wrote down the license number of the car. The daughter's husband and mother were not aware of her observations and did not hear appellant's alleged remark. The daughter said nothing to her husband and mother until they arrived in New York, later explaining that she did not wish to alarm her mother. Upon their arrival in New York, she told her husband about the incident and he called the police giving them the license plate number. The number was subsequently traced to a Hertz Rent-A-Car for which appellant was found to be signatory on the rental agreement.

Several weeks later, police showed her another group of photographs. All were mug shots except two, one of which was the appellant. She again failed to identify appellant as the man who had been in her father's home. She said she could not be sure until she again saw him in person. The following day, the appellant was arrested and placed in a line-up. At the line-up, the daughter "said [appellant] looked like the same person I had seen but I would like to hear him speak." All six men in the line-up were then asked to speak after which she identified appellant for the first time as the man who had been in her father's home at the time of the crime, three and one-half months earlier. At trial, she repeated her identification.

After having considered the totality of the circumstances affecting the identification in this case, we must conclude that (1) the identification process employed was unnecessarily suggestive and (2) the prosecution

failed to establish by clear and convincing evidence that the in-court identification had an "independent origin" in the witness's observations at the time of the crime.

Not only was there present the suggestiveness that came of repetitive display of the appellant's photograph, there was also the suggestiveness that occurred because appellant's photograph stood out as a significantly different type of photograph. Each of these factors, as *Simmons, supra* pointed out, increases the danger, inherent in all photographic identification procedures, that the identification process will lead to a misidentification. "[T]he witness . . . is apt to retain in [her] memory the image of the photograph rather than of the person actually seen . . ." at the time of the crime. Moreover, here the suggestiveness was heightened because appellant's photograph was the only one which depicted a person (1) wearing a *dark suit with white shirt* and tie, and (2) *a slender build,* and (3) a full-length front view.

Our analysis of the other factors compels the conclusion that the witness's in-court identification did not originate in her observations at the time of the crime. She had little opportunity to view the criminal at the time of the crime. Her degree of attention during her first momentary look was not affected by knowledge that anything unusual was happening. During her second momentary look, her view of the criminal's face was obscured by his arm. In addition, the criminal wore a hat and sunglasses further obscuring her view of his face. These circumstances alone cast serious doubt on the witness's ability to make an identification reliably based on what she saw at the time of the crime.

Although both the criminal and the appellant were of the same general build and may have had similar sounding voices, she described the criminal as nineteen to twenty-one years old, whereas the appellant was thirty-

two at the time of the crime. Other portions of her description of the criminal were general and could have applied to any tall, slender, black male. There was nothing unique or even unusual about the criminal's attire which could have connected it to the appellant.

Furthermore, the witness always failed to identify appellant's photograph. Only after three months of repeated viewings of his photograph did she first "recognize" appellant.

 If the warning in *Simmons, supra,* applies in any case, it surely applies here. ". . . [I]mproper employment of photographs by police may . . . cause witnesses to err in identifying criminals." *Id.* 390 U. S. at 383, 88 S.Ct. at 971, 19 L.Ed.2d at 1253 (1968). "It is the likelihood of [such] misidentification which violates a defendant's right to due process . . . ." *Neil v. Biggers,* 409 U.S. 188, 198, 410–411, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). The suppression court erred in failing to suppress the identification evidence.

There is no need to consider other issues raised by the appellant. One final note however: the inference that the prosecution would like us to draw from the *content* of the appellant's voice in the restaurant as distinguished from the *sound* of the voice is irrelevant to the reliability of the witness's identification. Moreover, whether or not the *content* was inculpatory is only pure speculation.

Judgments reversed and a new trial granted.

NIX, J., took no part in the consideration or decision of this case.

O'BRIEN, J., concurs in the result.

JONES, C. J., and POMEROY, J., dissent.