**COMMONWEALTH of Pennsylvania,
Appellee,**

v.

**Allen WADE, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 26, 2004.

Filed Jan. 19, 2005.

John Ciroli, Jr., Pittsburgh, for appellant.

Michael W. Streily, Deputy Dist. Atty., and Kevin F. McCarthy, Asst. Dist., Atty., Pittsburgh, for Com., appellee.

BEFORE: BENDER, PANELLA and POPOVICH, JJ.

OPINION BY BENDER, J.:

¶ 1 This is an appeal from a judgment of sentence imposed upon Appellant after he was convicted of one count of robbery and a variety of traffic offenses stemming from the robbery of a Payless shoe store and a high speed chase that occurred after the robbery. Appellant raises three questions for our review, which we rephrase as follows:

> Were Appellant's due process rights violated when the Commonwealth failed to disclose during discovery the circumstances of a post-robbery photo identification of Appellant;

> is the previous issue ripe for appellate review pursuant to *Commonwealth v. Johnson*, 565 Pa. 51, 771 A.2d 751 (2001), despite prior counsel's failure to include the issue in Appellant Rule 1925(b) statement where current counsel raised the issue in Appellant's brief and asserted prior counsel's ineffectiveness; and

> did the court err when it allowed testimony that had been previously precluded as a sanction against the Commonwealth for failing to comply with discovery rules to be admitted during rebuttal after Appellant testified in his own behalf and asserted that he did not commit the robbery in question?

We vacate and remand.

¶ 2 At approximately 8:45 p.m. on April 25, 2002, an armed robbery occurred at

the Payless Shoesource in Robinson Township, Allegheny County, Pennsylvania. At that time, Ms. Misty Rocchino, who was working the register at the Payless store, was approached by an African–American male, approximately 5'8"–5'10" tall, wearing an orange sweatshirt. As the man approached the cash register, Ms. Rocchino was waiting on a customer, later identified as Joanee Griffin, who had a small child with her. Ms. Griffin then turned away from the register momentarily whereupon the male displayed a portion of a hand gun and demanded Ms. Rocchino give him the money from the cash register. Upon turning her attention back to the cash register and observing this, Ms. Griffin grabbed her child and ran out of the store through the back door, activating the alarm as she went. After having some difficulty with the register Ms. Rocchino retrieved the available cash and gave it to the man. The man then directed Ms. Rocchino and another employee, Donna Hummel, to the back of the store and repeatedly demanded more money. After being assured numerous times that there was no more money, the man grabbed Ms. Rocchino's backpack and jacket and ran out the back door. Then Ms. Hummel ran to the front of the store to lock the door. Ms. Rocchino remained in the rear of the store and was surprised by the male's sudden reentry into the store through the back door. The robber's reentry was brief, however, as he simply threw the backpack and jacket on the floor and again retreated through the back door.

¶ 3 After Joanee Griffin escaped the store, she began screaming to individuals located nearby to call 9–1–1, as the Payless store was being robbed. Soon thereafter, as Ms. Griffin was looking for a place to hide she ran around the store and actually collided with the robber. The robber merely told her to "get out of here." Heeding the robber's warning, Ms. Griffin grabbed her daughter and ran in the opposite direction from the robber.

¶ 4 Shortly before 8:45 p.m. that evening, Frank Twardy pulled up next to a Bob Evans Restaurant located next door to the Payless store. Mr. Twardy's son was employed at the restaurant and Mr. Twardy was waiting for his son to finish his shift. As he was pulling into the parking lot, Mr. Twardy noticed a purple or maroon colored "T–Bird type car" parked along side the building. Soon thereafter, Mr. Twardy noticed an African–American male, approximately 5'8"–5'10" tall, wearing an orange sweatshirt walk across the front of the building and then back toward the maroon vehicle. Shortly after that, Mr. Twardy noticed the vehicle move across his vision toward the opposite side of the building until it left his field of vision. Mr. Twardy then noticed the same male walk in front of the building, enter the Payless store and then approach the counter where a young woman was working. Based upon the reactions of the young woman, Mr. Twardy became alarmed that a robbery was in progress. Consequently, Mr. Twardy went into the Bob Evans restaurant and called the police. Although Mr. Twardy had never seen the suspect in the maroon "T–Bird like" vehicle, Mr. Twardy mentioned the vehicle in any event. The police dispatcher taking the phone call replied that they had already received a call relating to a robbery in-progress at that location.

¶ 5 Officer Christian Short of the Robinson Township Police Department was on duty at the police station when the call regarding the robbery came into the station. Officer Short left the station and after entering his vehicle, received a radio bulletin from the dispatcher indicating that a robbery had occurred at the Payless store and to be on the lookout for a maroon Ford Thunderbird being driven by a

black man heading down Campbell's Run Road.[1] Officer Short went to a location next to Campbell's Run Road and waited to see if a vehicle matching the description passed by. Within a few minutes, Officer Short observed a vehicle generally matching the description drive by on Campbell's Run Road.[2] Officer Short turned and followed the vehicle but did not immediately attempt to stop the vehicle as he was awaiting the arrival of Officer Edward Krall of the Robinson Township Police. However, when the vehicle made its way onto the entrance ramp to the limited access "Parkway," Officer Short activated his lights and attempted to pull the vehicle over.

¶ 6 In response to the activation of the police emergency lights, the vehicle sped up and entered the Parkway heading toward Pittsburgh. Officer Short gave chase with Officer Krall a quarter-mile or so behind Officer Short. The vehicle continued toward Pittsburgh at a high rate of speed but then entered the south bound lane of Interstate–79 and continued traveling at a high rate of speed. Eventually the vehicle, while engaging in evasive maneuvers, went across the median toward the north bound lane and crashed. Officer Short observed an African–American male dressed in a white tee shirt exit the vehicle and run away from his approaching vehicle to a wooded area off the highway. Officer Short stopped and approached the now abandoned vehicle with caution. After assuring himself that there was nobody present, Officer Short conducted a search of the vehicle and discovered a handgun on the passenger side floor and the keys still in the ignition. Attached to the keys was

an identification card for Appellant, Allen Wade. When a state police trooper arrived, the name of Allen Wade and a description were broadcast over police radio indicating he was a suspect in the robbery of a shoe store.

¶ 7 While police officers from several jurisdictions began a manhunt for Appellant, Officers Short and Krall returned to the Payless store with Appellant's identification card and displayed the card to Ms. Rocchino and Ms. Hummel while indicating that the identification card belonged to someone they had caught in connection with the robbery. The officers asked the two women if the person depicted on the identification card was the person who had committed the robbery. Ms. Rocchino stated her belief that the identification card belonged to the robber. Ms. Hummel said she was unsure.

¶ 8 Some time later, Pennsylvania State Police Trooper Samuel Grande, who was working forensics at the time and driving a van, responded to the police report of a robbery suspect. Trooper Grande was driving on Morganza Road/Washington Pike, a road that runs parallel to Interstate 79, when he observed a man matching the description of the robbery suspect. He pulled up alongside the suspect and detained him. The individual turned out to be Appellant. When asked what he was doing, Appellant told Trooper Grande that he was waiting for a ride. Appellant indicated that he had been riding with a friend and that he got into an argument with the friend who then dropped him off. Appellant also gave Trooper Grande his name.

---

1. Although Officer Short testified that the dispatch alerted for a maroon colored vehicle, Officer Short's report indicates that the vehicle was purple leaving open to question whether the dispatch reported a purple or maroon vehicle.

2. The vehicle which passed by was actually a maroon Lincoln Mark VIII and was being driven by Appellant.

¶ 9 After Officers Short and Krall arrived on the scene, Appellant was arrested and returned to the police station for questioning. Appellant was subsequently charged with robbery and proceeded to a jury trial held June 25–26, 2003. At the conclusion of the trial, Appellant was found guilty as charged. Appellant was sentenced on September 8, 2003, and filed an appeal on October 2, 2003. Upon being ruled to do so, Appellant, represented by the Office of the Public Defender, filed a Rule 1925(b) statement of matters complained of on appeal. Subsequently, the case was transferred within the Public Defender's Office to present counsel who filed a brief pursuing one issue contained in the Rule 1925 statement and another that was not.

¶ 10 Because resolution of the Appellant's first issue is complicated by questions of waiver, we shall address the second issue first. Appellant contends that the court erred in allowing testimony that had been precluded from introduction in the Commonwealth's case-in-chief to be introduced on rebuttal. We agree. At trial, defense counsel was surprised by the testimony of Joanee Griffin to the effect that she literally ran into the robber after fleeing from the shoe store. Based upon the police report, defense counsel believed that although Ms. Griffin witnessed a portion of the robbery, she could not identify Appellant as the robber. Counsel promptly asked for a side bar conference and argued that she had been unfairly surprised by this testimony and that, as a result of the Commonwealth's failure to disclose this fact in the police report, the testimony should be precluded. The court agreed and precluded Ms. Griffin from identifying Appellant. However, after the close of Appellant's case, in which Appellant took the stand and testified that he did not rob the shoe store, the ADA sought to introduce Ms. Griffin's identification testimony

by way of rebuttal. Defense counsel objected, however, the court allowed the testimony.

■ ¶ 11 Appellant essentially argues that in allowing the introduction of Ms. Griffin's identification testimony the court removed the sanction imposed against the Commonwealth for violating the rules of discovery and that a shrewd prosecutor could purposely fail to disclose key evidence during discovery and be granted a license to admit it in rebuttal any time a defendant took the stand and proclaimed his innocence. We agree that the admission of the testimony was error.

¶ 12 In arguing that the trial court properly allowed the previously precluded testimony in on rebuttal, the Commonwealth cites to two cases, *Commonwealth v. Baxter*, 367 Pa.Super. 342, 532 A.2d 1177 (1987), and *Commonwealth v. Batson*, 396 Pa.Super. 513, 578 A.2d 1330 (1990). These two cases dealt with the allowance of testimony, during rebuttal, relating to inculpatory statements or confessions of the defendant which were made after arrest and which had been suppressed due to either *Miranda* violations or a unconstitutional denial of counsel. In these two cases, once the defendant took the stand and proclaimed his innocence, or altered his story from the prior statement, evidence of their prior inculpatory statements was found to be properly admissible. Although the Commonwealth relies heavily upon these two cases, we find them inapposite.

¶ 13 In the first place, admission of the inculpatory statements in *Baxter* and *Batson* came under the theory that the exclusion of a voluntary inculpatory statement cannot constitute license for the defendant to alter his statement to his benefit at trial without fear that his prior inconsistent statements would be used against him. In

the present case, the evidence in question is not a prior inconsistent statement of Appellant. Moreover, Appellant's prior inconsistent statements to the police were rightfully introduced to cast doubt as to his trial testimony. The evidence in question here is the statement of another person, *i.e.*, Ms. Griffin. As such, *Baxter* and *Batson* are clearly distinguishable. Also, admission of the inculpatory statements in *Baxter* and *Batson* constituted direct rebuttal of the defendant's later exculpatory statement. That is, there were two inconsistent statements from the same individual. Obviously, both could not be true. In the present case, the identification testimony of Ms. Griffin is merely cumulative evidence tending to contradict Appellant's testimony, it is not an inconsistency from the mouth of Appellant. Also, while undoubtedly Ms. Griffin would be testifying in a truthful manner, it is possible that she could be mistaken. As such, her testimony does not represent the same form of inconsistency found in *Baxter* and *Batson*.

¶ 14 Beyond the above distinction, it appears that our Supreme Court has addressed a very similar circumstance and found that allowing the precluded evidence to be admitted in rebuttal constituted error. In *Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265 (1992), Carlos Moose and Quinterio Smart were being tried for participating in a rape/murder. The Commonwealth failed to disclose during discovery the fact that it had obtained a statement from a witness named Sonny Oglesby to the effect that Moose had admitted to Oglesby that he had raped the victim and hit her with a rock. In a statement given to the police, Moose had admitted to being present when Smart had raped the victim but had denied either raping or hitting the woman. When the Commonwealth revealed at the time of trial that it had secured Oglesby's statement, the defense objected and asked for

a continuance. After the court indicated it was inclined to grant a continuance, the Commonwealth agreed to forego use of the statement as a type of sanction for failing to disclose the statement during discovery. Based upon that understanding, Moose took the stand and testified that he was with Smart when Smart raped the woman but that he was very intoxicated and never touched the woman. Moose also testified that when Smart began beating the woman, he ran off.

¶ 15 After Moose testified, the Commonwealth, over a defense objection, sought to have Oglesby testify in rebuttal as to Moose's incriminating statements and the court allowed the testimony. After Moose was convicted he took an appeal to this Court, which vacated his judgment of sentence. The Commonwealth appealed our decision to the Pennsylvania Supreme Court which affirmed. The Supreme Court found that the court had committed reversible error by allowing Oglesby to testify on rebuttal after previously excluding the testimony as a sanction for a discovery violation. With respect to the allowance of the precluded testimony on rebuttal, the Court stated:

> The actions of the trial judge in this instance are rather inexplicable, as he indicated during the colloquy about the rebuttal evidence that he had excluded the evidence. (*See infra* excerpts of testimony). *The judge's decision to reverse himself without explanation during the middle of trial constituted an abuse of discretion.*

> What is particularly harmful about this case is that the appellee evidently relied upon the agreement not to use the statement of Oglesby. In fact, defense counsel stated during a conference with the judge at the commencement of trial that he did not need a copy of the statement, since Oglesby would not be testifying.

Furthermore, in reliance upon the agreement that the statement would not be used, the appellee took the stand—unaware of the precise content of Oglesby's statement and certainly not knowing that it would be used to impeach him. This reasonable reliance on the statements of the district attorney and the prior ruling of the trial court deprived the appellee of due process of law. Once the district attorney stated unconditionally that he would not use the statement and the trial court permitted the trial to proceed on that basis, it was fair to assume the statement was not to be used for any purpose, including rebuttal. "Discovery decisions . . . recognize that the Commonwealth's failure to disclose possible impeachment or rebuttal evidence may highly prejudice the defendant's case and lead to reversible error when the evidence is sprung on the defendant unawares."

*Id.* at 1274–75.

¶ 16 While the reasoning reflected in the above quote focuses upon the prejudice to the criminal defendant when the trial court reverses itself as to a decision to exclude evidence, the Supreme Court was equally worried that a contrary stance would invite trial by ambush and unfair surprise. Indeed, by allowing the precluded testimony to be introduced on rebuttal, the purpose of imposing a sanction is, for the most part, eliminated. That is, the purpose of precluding the testimony is to create incentive to comply with the rules of discovery. As the Appellant correctly points out, if a discovery sanction against the Commonwealth is reversed anytime the defendant takes the stand and provides exculpatory testimony, it could reduce the disincentive for failing to comply with discovery rules. Stated in positive terms, reversal of a discovery sanction would tend to make it more advantageous for the Commonwealth to withhold infor-

mation, particularly where the need for the defendant to testify is perceived to be high. Thus, it would encourage trial by ambush. When considering this circumstance, our Supreme Court expressed disapproval. The Court stated:

In essence, what the district attorney appears to have attempted to do was to try his case with last minute disclosures. Such a plan was fundamentally unfair and violated the discovery rules. The purpose of the discovery rules is to permit the parties in a criminal matter to be prepared for trial. Trial by ambush is contrary to the spirit and letter of those rules and cannot be condoned. We agree with the statement of the Superior Court in a similar instance, remarking that "[o]ur court has condemned such gamesmanship in criminal prosecutions." *Commonwealth v. Thiel,* 323 Pa.Super. 92, 100, 470 A.2d 145, 149 (1983). In *Thiel,* the Commonwealth "left the [evidence] conspicuously out of its short pretrial list of tangible evidence in its possession, and used the [evidence] skillfully in rebuttal." *Id. See also* Comment to Rule 305.

*Id.* at 1274.

¶ 17 Based upon *Moose,* we conclude that the trial court erred in allowing the previously precluded identification testimony to be introduced in rebuttal.

¶ 18 Appellant further contends that he was prejudiced by the Commonwealth's failure to disclose that Appellant's identification card had been shown to two victims of the robbery shortly after the robbery had been committed. While under cross-examination, Ms. Rocchino revealed, for the first time, that approximately 90 minutes to two hours had passed after the robbery when, police officers returned and showed her Appellant's identification card while indicating that it was the ID of an

individual they "had caught" in connection with the robbery. Testimony of Ms. Rocchino's co-worker, Donna Hummel, revealed that she too had been shown the ID card. When direct examination of Ms. Griffin revealed another surprise, that Ms. Griffin had run into the robber in the front of the store as the robber was fleeing, counsel requested a side bar and then subsequently asked for a mistrial, in part because of the failure of the Commonwealth to disclose the license identification. That request was denied.

¶ 19 Resolution of the above issue is complicated by the fact that although trial counsel promptly sought a mistrial due to the non-disclosure of the license identification, thereby preserving the challenge for appellate review, post-trial/initial appeals counsel neglected to include this issue in Appellant's Pa.R.A.P 1925 statement of matters complained of on appeal, thus rendering the issue waived under *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306 (1998). Subsequent to *Lord*, our Supreme Court issued an opinion, *Commonwealth v. Johnson*, 565 Pa. 51, 771 A.2d 751 (2001)(plurality),[3] indicating that a claim that appellate review of an issue had been lost or waived due to a failure to include it in a Rule 1925 statement could be raised on direct appeal. The effect of raising the claim in the context of appellate counsel's ineffectiveness is to void the waiver of the issue pursuant to *Lord* and allow review on direct appeal, although casting the issue into the midst of an ineffectiveness analysis, *i.e.*, unless the issue was meritorious, counsel would not be deemed ineffective for failing to raise it in a 1925 statement and relief would not be granted.

¶ 20 Pursuant to *Johnson*, Appellant's current counsel has indeed raised the issue of prior counsel's ineffectiveness in failing to include the properly raised issue in Appellant's Rule 1925 statement. However, the Commonwealth, citing to *Commonwealth v. Dent*, 837 A.2d 571 (Pa.Super.2003), and *Commonwealth v. Butler*, 845 A.2d 866 (Pa.Super.2004), argues that a *Johnson* claim is no longer viable in light of the Supreme Court's decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). Generally speaking, *Grant* dictates that except under certain circumstances, allegations of ineffective assistance of trial counsel must await post-conviction collateral attack. The primary rationale behind the *Grant* rule is that ineffectiveness claims should be resolved on fully developed records and that, in most cases, allegations of ineffectiveness require counsel to testify and explain strategic choices made during trial. Most often, such testimony is not available to the appeals court on direct appeal.

¶ 21 We agree with the Commonwealth that *Johnson* has clearly been impacted by the subsequent decision in *Grant*. In particular, we would not contest this proposition to the extent the underlying issue asserted trial counsel ineffectiveness. That is, we readily agree that *Grant* cannot be avoided by simply layering a claim of ineffectiveness of appellate counsel atop a claim of ineffectiveness of trial counsel. However, by its very wording, *Grant* applies to allegations of ineffectiveness of **trial** counsel. In *Grant*, at the conclusion of the Majority Opinion, the Court announced its holding thusly, "We now hold that, as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant*, 813 A.2d at 738.

---

**3.** Although *Johnson* is a plurality decision of the Supreme Court, we note that the decision has been applied by this Court. *See Commonwealth v. Mackert*, 781 A.2d 178 (Pa.Super.2001). Consequently, the *Johnson* rule has precedential approval.

¶ 22 If the rationale behind *Grant* is that claims of ineffectiveness of trial counsel are better resolved upon collateral review because an adequate record is seldom available upon direct appeal, then the rationale may not apply when the only allegation of ineffectiveness is that of counsel's failure to properly raise a meritorious issue. This is so because, generally speaking, there can be no acceptable strategic reason for not raising a meritorious issue on appeal. Thus, if the issue is indeed deemed meritorious by the appellate court, it would be essentially pointless to defer resolution to a post-conviction proceeding.

¶ 23 Although *Butler* does question the continuing viability of *Johnson* in light of *Grant*, *Butler*, 845 A.2d at 869, we note that *Butler* involved a case where both appellate counsel and trial counsel's ineffectiveness were alleged. Additionally, *Dent* involved a case where, as here, the allegation of ineffectiveness was of appellate counsel's failure to raise a meritorious issue in a Rule 1925 statement. There, we ultimately reviewed the claim on direct appeal, although we did so based upon the fact that due to the circumstances, post-conviction relief would likely be unavailable.[4] As such, while the opinion, in dictum, suggests that *Johnson* is no longer viable in light of *Grant*, it cannot be viewed as a definitive holding, at least where the ineffectiveness relates to failure to raise an issue in a Rule 1925 statement.[5]

■ ¶ 24 Given that the general purpose of *Grant* is not obviated when reviewing the claim of ineffectiveness currently be-fore us and given that neither *Butler* nor *Dent* hold to the contrary, we are inclined to view *Johnson* as still viable where the only allegation of ineffectiveness relates to appellate counsel's failure to preserve an issue for appellate review.

■ ¶ 25 Appellant contends that he is entitled to relief due to the Commonwealth's failure to disclose the circumstances of the photo identification of Appellant after his ID card was recovered. We agree. In the present case, after Appellant abandoned his vehicle on the Interstate, police recovered his ID and returned to the scene of the robbery and simultaneously displayed the ID card to the two employees who had been in the store during the robbery, while indicating that this was the individual they had caught in connection with the robbery. As Appellant points out, the circumstances of this identification are highly suggestive and violate established police procedure designed to provide for untainted identifications. Indeed, Appellant provides a highly persuasive quote on the matter in his brief from no less an authority that the United States Supreme Court. The Court stated:

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and

---

4. A similar theory was relied upon in reviewing the ineffectiveness claim in the case of *In the Interest of B.S.*, 831 A.2d 151 (Pa.Super.2003).

5. We are also of the opinion that *Commonwealth v. Pollard*, 832 A.2d 517 (Pa.Super.2003), does not compel a different result. In *Pollard*, a panel of this court "declined" to address Appellant's allegations of appellate counsel's ineffectiveness where the allegation was a simple, non-specific allegation that counsel was ineffective for filing an *Anders* Brief. Obviously, a non-specific and/or generalized allegation of appellate counsel's ineffectiveness contrasts with the very specific allegation that appellate counsel failed to raise a meritorious claim as is found here.

show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

*Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (quoted with approval in *Commonwealth v. Fowler,* 466 Pa. 198, 352 A.2d 17, 20 (1976)).

¶ 26 In the case at bar, many of the pitfalls or warnings identified by the United States Supreme Court relating to photographic identifications are present here. The two robbery victims were shown only a single photograph and were told by police that the photo was of the man caught in connection with the robbery. The statements of the police in this regard would have the tendency to reinforce the fact that the person in the photograph was indeed the person who perpetrated the robbery and certainly it would be consistent with human nature for the victims to be hopeful that the robber would have been caught. Moreover, the two victims were shown the photo together, which could allow for a mutual reinforcement situation. Indeed, according to Donna

Hummel, Misty Rocchino was shown the photo first and indicated that she believed it was the perpetrator of the robbery. Ms. Rocchino made this comment in Ms. Hummel's presence **before** Ms. Hummel even had the opportunity to observe the photo. This factor could subconsciously influence not only her identification at the scene but later identifications as well.

¶ 27 When a pre-trial photographic identification is challenged by suppression motion for being unduly suggestive, the burden falls upon the Commonwealth to establish that "any identification testimony to be offered at trial is free from taint of initial illegality." *Commonwealth v. Moore,* 534 Pa. 527, 633 A.2d 1119, 1125 (1993). In the present case, due to the Commonwealth's failure to disclose the circumstances of the photo identification, Appellant was denied the opportunity to contest the admissibility of the identifications of Misty Rocchino and Donna Hummel and to put the burden upon the Commonwealth to establish the reliability of the identifications. Moreover, even if the identifications would have ultimately been ruled admissible, it is not difficult to believe that Appellant's defense was also hindered with respect to the photo identification of Appellant as counsel was surprised by the information and may very well have been able to mount a serious discrediting attack upon the identification if properly notified of the details of the identification. In the very least, counsel should not be placed in the position of having to conduct a defense of her client while being surprised by such crucial information in the middle of trial. In this context, we believe it was error for the trial court not to grant a mistrial when requested.

¶ 28 Since there was clearly an issue of merit relating to the failure to grant a

mistrial due to the Commonwealth's failure to disclose critical information relating to the post-incident photographic identification of Appellant, we conclude that post-trial/initial appeals counsel was ineffective in failing to include the issue in Appellants Rule 1925 statement. While we believe a new trial is mandated by the error in allowing the rebuttal testimony of Ms. Griffin, this issue provides an even greater basis for granting a new trial.

¶ 29 For the foregoing reasons, we will vacate the judgment of sentence and grant Appellant a new trial. Prior to a new trial being held, Appellant will have the opportunity to challenge the identification testimony of Misty Rocchino and Donna Hummel.

¶ 30 Judgment of sentence vacated, remanded for new trial. Jurisdiction relinquished.