J-A05001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT VON PAILLETT | : | |
| | : | |
| Appellant | : | No. 1710 WDA 2018 |

Appeal from the Judgment of Sentence Entered October 30, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0012551-2017

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 07, 2020**

Appellant, Robert Von Paillett, appeals from the judgment of sentence of three to six months' incarceration, and a consecutive one-year term of probation, imposed after he was convicted of theft by unlawful taking following a non-jury trial.  On appeal, Appellant solely argues that the eyewitness-identification evidence was insufficient to support his conviction.  After careful review, we affirm.

The trial court summarized the facts of Appellant's case, as follows:

> This matter arises out of the arrest of [Appellant] following a theft that occurred on August 28, 2017[,] at the Five Generations Bakery in McKees Rocks, Pennsylvania.  The victim, Anita DeFratti, testified that on August 28, 2017[,] she was employed at the Five Generations Bakery and she was getting ready to prepare the store for closing when a man she had never seen before entered the store.  She testified:

---

[*] Retired Senior Judge assigned to the Superior Court.

[]A. I said, ["C]an I help you?["] He said, ["]I've never been here before.["] I kind of explained the situation of the store and what it's about. He handed me supposedly an EBT card, which [did not resemble cards used] here in Pennsylvania[,] because … I know [what] they look like because we accept them.

Q. What is an EBT card?

A. It's a food card, medical card that the state provides.

A. So he says[, "W]ell can you run it and see if there is any money on it.["] I said[, "T]his isn't what the card is for.["] And I slid it and I said there was nothing that show[ed] up and he turned around and walked out of the store.[]

Approximately an hour later[,] she went to get her purse, which she had placed underneath the front desk at the cash register, and she could not find it. She searched the store to make sure she had not misplaced it[, and] then called her supervisor to let her know that her purse had been taken. The following day she reviewed surveillance video that was taken at the store and it showed the man she had spoken to going behind the counter and taking her purse. At trial, the Commonwealth offered 12 still photographs taken from the surveillance video[,] which [Ms. DeFratti] identified as showing [Appellant] going behind the counter and taking her purse. [Ms. DeFratti] testified that the purse contained a debit card, her driver's license and sixty dollars.

Defense counsel cross[-]examined [Ms. DeFratti] concerning [Appellant's] height and the presence or absence of tattoos on his arms as shown on the photographs. [Ms. DeFratti] indicated that she could not give an accurate estimate of the height of the individual shown in the photograph because of the perspective of the photos[,] but [she] testified that she was 5'2" tall and the actor was five to six inches taller than her. In addition, she testified that it was not clear if the photographs showed tattoos on the actor's arm or not. On re-cross-examination[, Ms. DeFratti] testified that she saw [Appellant] the following day in the neighborhood and took a photograph of him, but the photograph was not produced at trial.

The Commonwealth also called Officer Darren Young of the McKees Rocks Police Department who testified that, although he was not involved in the investigation, he was shown still photographs taken from the bakery surveillance video by the

investigating officer and he was immediately able to identify [Appellant] as the individual shown in the photographs. Officer Young testified that not only was he born and raised in the McKees Rocks area but had been employed as a police officer in McKees Rocks for 14 years and had dealt with [Appellant] both directly and indirectly. Officer Young testified that "[Appellant] likes to hang in Hayes Manor" and he had "known him for the last few years."

Following the close of the Commonwealth's testimony, [Appellant] made a motion for judgment of acquittal asserting that the identification testimony of [Ms. DeFratti] and Officer Young was unreliable and insufficient. The motion was denied. [Appellant] then testified that he was 29 years old and that [he] was 5'7" tall and weighed approximately 215 to 220 pounds. He also testified that he had the word "Martino" tattooed on his left forearm and the number "3500" tattooed on his right forearm and that he had the tattoos since he was 15 years old. He also testified that he had never met [Ms. DeFratti] or been in the Five Generations Bakery and had lived in McKees Rocks since November 2017. After taking the matter under advisement, [Appellant] was found guilty as noted above.

Trial Court Opinion (TCO), 6/20/19, at 2-4 (citations to the record omitted).

On October 11, 2018, Appellant was sentenced to the term set forth *supra*. He filed a post-sentence motion, which was denied on October 30, 2018. Appellant then filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed its Rule 1925(a) opinion on June 20, 2019. Herein, Appellant states one issue for our review:

I. Whether [Appellant's] conviction for [t]heft by [u]nlawful [t]aking must be reversed because the eyewitness identification evidence submitted by the Commonwealth was so vague and unreliable as to be insufficient as a matter of law to sustain the guilty verdict?

Appellant's Brief at 5.

For a challenge to the sufficiency of the evidence,

[t]he standard we apply ... is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011) (quoting

*Commonwealth v. B. Jones*, 874 A.2d 108, 120–21 (Pa. Super. 2005)).

"This standard is equally applicable in cases where the evidence is

circumstantial, rather than direct, provided that the combination of evidence

links the accused to the crime beyond a reasonable doubt." *Commonwealth*

*v. Cox*, 686 A .2d 1279, 1285 (Pa. 1996).

Moreover,

"evidence of identification need not be positive and certain to sustain a conviction." *Commonwealth v. S. Jones*, 954 A.2d 1194, 1197 (Pa. Super. 2008), *appeal denied,* 599 Pa. 708, 962 A.2d 1196 (2008). Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. *Commonwealth v. Minnis,* 458 A.2d 231, 233–34 (Pa. Super. 1983). Out-of-court

identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. ***Id.*** at 234. Given additional evidentiary circumstances, "any indefiniteness and uncertainty in the identification testimony goes to its weight." ***Id.*** at 233.

***Commonwealth v. Orr***, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*).

In this case, Appellant contends that the identification evidence was so weak and inconclusive that it could not support his conviction. He stresses that Ms. DeFratti did not provide any description of the perpetrator after the crime, and the only identification she made of Appellant was during trial. He further avers that, "[e]ffectively, the only description provided of the individual [who committed the crime] was the 12 photographs" taken from the surveillance video in the bakery. Appellant's Brief at 16. According to Appellant, Officer Young's identification of him from those pictures was insufficient to support his conviction, as the "clear view" of the man in the photographs showed that the man had "no discernable tattoos," while Appellant has two tattoos on his forearms. ***Id.*** at 13.

Appellant further argues that the ostensibly weak identifications in this case are comparable to the identifications deemed insufficient in ***Commonwealth v. Crews***, 260 A.2d 771 (Pa. 1970), and ***Commonwealth v. Wiley***, 432 A.2d 220 (Pa. Super. 1981). In ***Crews***, an eyewitness who saw two men fleeing from the scene of a robbery and fatal beating could only offer a general description of their height and color, and state that one perpetrator was wearing a black trench coat and the other was wearing a gold-

colored sweater similar to one found in Crews' home. ***Crews***, 260 A.2d at 772. In deeming this identification evidence insufficient, the Court declared:

> In light of the myriads of people who fit the height and coloration description, and in light of the commonness of a gold sweater and a black trench coat, the evidence failed to point with sufficient certitude to Crews as the perpetrator of the crime. The jury was forced to guess whether it was Crews or another light-complexioned [black] male wearing a gold sweater who committed the crime. Our system recoils at sending a man to prison for the rest of his life on a guess.

***Id.***

In ***Wiley***, one eyewitness to a burglary, Barbara Carnino, testified that she only saw the perpetrator for a few seconds, she observed that he was "a black male of medium build" but she could not see his face, and she believed that the man she saw was an individual named Butchy Deas, "whom she had employed in the past…." ***Wiley***, 432 A.2d at 221. A second eyewitness, Phillip Craig, testified that he only "partially" saw the perpetrator's face for a few seconds and, while he thought it was [Wiley], whom Craig had known for six years, it could have also been Butchy Deas. ***Id.*** In deeming this testimony insufficient to support Wiley's conviction, we stressed that Carnino had identified a different man than Wiley, Craig was uncertain in his identification, and there was no other evidence tying Wiley to the crime. ***Id.*** at 225, 226.

Here, unlike in ***Crews*** and ***Wiley***, Ms. DeFratti unequivocally identified Appellant at trial. Moreover, as the trial court explained,

> [t]here [was] no evidence that she did not have an adequate opportunity to observe the actor. There is no evidence that the encounter took place in a darkened area or that [Appellant's] face

or physical characteristics were covered or obscured in any way. There was no evidence that the encounter was so traumatic or stressful that [Ms. DeFratti] might [have] be[en] distracted from being able to observe the actor. In addition, while the encounter between [Appellant] and [Ms. DeFratti] was relatively brief, she testified that the encounter was long enough for them to have a conversation about the store and his EBT card[,] and she attempted to process the card before handing it back. Within an hour of the conversation with [Appellant,] she realized that her purse had been taken and, therefore, her recollection of the actor was relatively fresh when she became aware of the theft. In addition, the following day[,] she saw the video surveillance[,] which showed the actor and then saw him on the street and took a picture of him. Finally, there was no evidence that she did not or was not able to identify him at any earlier time or that she had ever equivocated in her identification. [Ms. DeFratti] testified credibly concerning the events surrounding the theft and her identification of [Appellant,] and there was no basis to disregard her testimony.

TCO at 7.

Additionally, Officer Young's identification of Appellant as the individual depicted in the 12 photographs taken from the video surveillance corroborated Ms. DeFratti's in-court identification of Appellant as the perpetrator. While Appellant insists that the perpetrator in the photographs does not have forearm tattoos as he does, we have examined the pictures and disagree with that claim. The pictures do not depict the individual's arms clearly enough to discern whether or not he has tattoos. Therefore, we agree with the trial court that the images "did not definitively establish that [Appellant] was not the actor depicted in them." *Id.* at 7, 8. The photographs do, however, show the individual's face clearly enough for Officer Young to have identified Appellant as the person in the pictures. That identification, along with Ms. DeFratti's

unequivocal in-court identification, make this case distinguishable from *Crews* and *Wiley*, and were sufficient to support Appellant's conviction for theft.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/72020